# EXHIBIT 2

# 4.7 Terminal Illness, Advance Directives and Death

## I.  Purpose and Scope

This detention standard ensures that each facility's continuum of health care services addresses terminal illness and advance directives, and provides specific guidance in the event of a detainee's death.

This detention standard applies to the following types of facilities housing ICE/ERO detainees:

- Service Processing Centers (SPCs);
- Contract Detention Facilities (CDFs); and
- State or local government facilities used by ERO through Intergovernmental Service Agreements (IGSAs) to hold detainees for more than 72 hours.

*Procedures in italics are specifically required for SPCs, CDFs, and Dedicated IGSA facilities.*  Non-dedicated IGSA facilities must conform to these procedures or adopt, adapt or establish alternatives, provided they meet or exceed the intent represented by these procedures.

Various terms used in this standard may be defined in standard "7.5 Definitions."

## II. Expected Outcomes

The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices").

1.  The continuum of health care services provided to detainees shall address terminal illness and advance directives. Appropriate to the circumstances, each detainee shall be provided with an option to complete an advance medical directive;

2.  *\*\*The facility shall be in compliance with standards set by the National Commission on Correctional Health Care (NCCHC) in its provision of medical care to terminally ill detainees.*

3.  In the event of a detainee's death, or a detainee becomes gravely ill, specified officials as listed herein and required by ICE policies and the detainee's designated next of kin shall be notified immediately;

4.  In the event of a detainee's death, required notifications shall be made to authorities outside of ICE/ERO (e.g., the local coroner or medical examiner), and required procedures shall be followed regarding such matters as autopsies, death certificates, burials and the disposition of decedent's property. Established guidelines and applicable laws shall be observed in regard to notification of a detainee death while in custody;

5.  The health services administrator (HSA) at the facility where the detainee was housed at the time of his/her death shall ensure the decedent's medical record is reviewed for completeness and closed out; and

6.  In the event of a detainee death, all property of the detainee shall be returned within two weeks to the detainee's next of kin, unless property of the decedent is being held as part of an investigation into the circumstances of death;

7.  The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP). The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and note-takers, as needed. The facility will also provide detainees who are LEP with language assistance, including

bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

All written materials provided to detainees shall generally be translated into Spanish. Where practicable, provisions for written translation shall be made for other significant segments of the population with limited English proficiency.

Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.

## III. Standards Affected

This detention standard replaces "Terminal Illness, Advance Directives and Death" dated 12/2/2008.

## IV. References

National Commission on Correctional Health Care, *Standards for Health Care in Jails* (2014).

ICE/ERO *Performance-based National Detention Standards 2011:* "4.3 Medical Care."

ICE Directive on "Notification and Reporting of Detainee Deaths," Directive 7.9-0, October 1, 2009

## V. Expected Practices

### A. Terminal Illness

When a detainee's medical condition becomes life-threatening, the facility's clinical medical authority (CMA), or HSA, shall:

1. Arrange the transfer of the detainee to an appropriate off-site medical or community facility if appropriate and medically necessary; and

2. Immediately notify the facility administrator and/or ICE/ERO Field Office Director both verbally and in writing of the detainee's condition. The memorandum shall describe the detainee's illness and prognosis.

The facility administrator, or designee, shall immediately notify ICE/ERO and IHSC.

A detainee in a community hospital remains detained under ICE/ERO authority, such that ICE/ERO retains the authority to make administrative, non-medical decisions affecting the detainee (visitors, movement, authorization of care services, etc.). However, upon physical transfer of the patient to the community hospital's care, the hospital assumes:

1. medical decision-making authority consistent with the contract (drug regimen, lab tests, x-rays, treatments, etc.); and

2. authority over the detainee's treatment, which is exercised by the hospital's medical staff once IHSC is notified of admission. However, IHSC managed care and the facility's HSA shall follow up on a daily basis to receive information about major developments.

To that end, the hospital's internal rules and procedures concerning seriously ill, injured and dying patients shall apply to detainees. The Field Office Director or designee shall immediately notify (or make reasonable efforts to notify) the detainee's next-of-kin of the medical condition and status, the detainee's location, and the visiting hours and rules at that location, in a language or manner which they can understand.

ICE/ERO, in conjunction with the medical provider, shall provide family members and any others as much opportunity for visitation as possible, in keeping with the safety, security and good order of the facility. Facility staff shall be reminded to observe and maintain safety and security measures while finding ways to respectfully accommodate the family and detainee needs at this sensitive time.

### B. Living Wills and Advance Directives

Once a detainee is diagnosed as having a terminal illness or remaining life expectancy of less than one year, the medical staff shall offer the detainee access

to forms or other related materials on Advance Directives or Living Wills, including the appropriate translation services when needed. Likewise, when the detainee is held at an off-site facility, staff at that facility may assist the detainee in completing an Advance Directive and/or Living Will.

All facilities shall use the State Advance Directive form, appropriate to the state in which the facility is located, for implementing Living Wills and Advance Directives, the guidelines for which include instructions for detainees who wish to:

1. have a living will other than the generic form made available by medical staff; or

2. appoint another individual to make advance decisions for him/her.

At any time, a detainee may request forms or other related materials on Advance Directives or Living Wills. These may be prepared by the detainee's attorney at the detainee's expense.

When the terms of the Advance Directive must be implemented, the medical professional overseeing the detainee's care shall contact the appropriate ICE/ERO representative.

ICE/ERO may seek judicial or administrative review of a detainee's Advance Directive as appropriate.

## C. Do Not Resuscitate (DNR) Orders

Each facility holding detainees shall establish written policy and procedures governing DNR orders. Local procedures and guidelines must be in accordance with the laws of the state in which the facility is located.

Health care shall continue to be provided consistent with the DNR order. If the DNR order is not physically present or there is any question about the validity of the document, appropriate resuscitative aid shall be rendered until the existence of an active, properly executed DNR is verified.

Each facility's DNR policy shall comply with the following stipulations:

1. a DNR written by a staff physician requires the CMA's approval;

2. the policy shall protect basic patient rights and otherwise comply with state requirements and jurisdiction in which the facility is located;

3. a decision to withhold resuscitative services shall be considered only under specified conditions:

   a. the detainee is diagnosed as having a terminal illness;

   b. the detainee has requested and signed the order (if the detainee is unconscious, incompetent, or otherwise unable to participate in the decision, staff shall attempt to obtain the written concurrence of an immediate family member, and the attending physician shall document these efforts in the medical record); and

   c. the decision is consistent with sound medical practice, and is not in any way associated with assisting suicide, euthanasia or other such measures to hasten death; and

4. the detainee's medical file shall include documentation validating the DNR order:

   a. a standard stipulation at the front of the in-patient record, and explicit directions: "do not resuscitate" or "DNR"; and

   b. forms and memoranda recording:

      1) diagnosis and prognosis;

      2) express wishes of the detainee (e.g., living will, advance directive, or other signed document);

      3) immediate family's wishes, if immediate family has been identified;

      4) consensual decisions and recommendations of medical professionals, identified by name and title;

      5) mental competency (psychiatric) evaluation, if detainee concurred in, but did

not initiate, the DNR decision; and

6) informed consent evidenced, among other things, by the legibility of the DNR order, signed by the ordering physician, and CMA; and

5. a detainee with a DNR order may receive all therapeutic efforts short of resuscitation;

6. the facility shall follow written procedures for notifying attending medical staff of the DNR order; and

7. as soon as practicable, the CD or HSA shall notify the IHSC medical director and the respective ICE Office of Chief Counsel of the basic circumstances of any detainee for whom a DNR order has been filed in the medical record.

## D. Organ Donation by Detainees

If a detainee wants to donate an organ:

1. the organ recipient must be a member of the donor's immediate family;

2. the detainee may not donate blood or blood products;

3. all costs associated with the organ donation (e.g., hospitalization, fees) shall be at the expense of the detainee, involving no Government funds;

4. the detainee shall sign a statement that documents his/her:

   a. decision to donate the organ to the specified family member;

   b. understanding and acceptance of the risks associated with the operation;

   c. that the decision was undertaken of his/her own free will and without coercion or duress; and

   d. understanding that the Government shall not be held responsible for any resulting medical complications or financial obligations incurred;

5. IHSC medical staff shall assist in the preliminary medical evaluation, contingent on the availability of resources; and

6. the facility shall coordinate arrangements for the donation.

## E. Death of a Detainee in ICE/ERO Custody

Each facility shall have written policy and procedures to be followed to notify ICE/ERO officials, next-of-kin and consulate officials of a detainee's death, in accordance with ICE Directive on Notification and Reporting of Detainee Deaths, Directive 7.9-0, October 1, 2009.

## F. Disposition of Property

Facilities shall turn over the property of the decedent to ICE/ERO within one week for processing and disposition. Unless property of a decedent is being held as part of an investigation into the circumstances of death, that property should be returned to the decedent's next of kin, if known, within two weeks.

## G. Disposition of Remains

Within seven calendar days of the date of notification, either in writing or in person, the family shall have the opportunity to claim the remains. If the family chooses to claim the body, the family shall assume responsibility for making the necessary arrangements and paying all associated costs (e.g., transportation of body, burial).

If the family wishes to claim the remains, but cannot afford the transportation costs, ICE/ERO may assist the family by transporting the remains to a location in the United States. As a rule, the family alone is responsible for researching and complying with airline rules and federal regulations on transporting the body; however, ICE/ERO may coordinate the logistical details involved in returning the remains.

If family members cannot be located or decline orally

or in writing to claim the remains, ICE/ERO shall notify the consulate, in writing, after which the consulate shall have seven calendar days to claim the remains and be responsible for making the necessary arrangements and paying all costs incurred (e.g., moving the body, burial).

If neither the family nor the consulate claims the remains, ICE/ERO shall schedule an indigent's burial, consistent with local procedures. However, if the detainee's record indicates U.S. military service, before proceeding with the indigent burial arrangements, ICE/ERO shall contact the Department of Veterans Affairs to determine whether the decedent is eligible for burial benefits.

The Chaplain may advise the facility administrator and others involved about religious considerations that could influence the decision about the disposition of remains.

Under no circumstances shall ICE/ERO authorize cremation or donation of the remains for medical research.

## H. Death Certificate

The facility administrator shall specify policy and procedures regarding responsibility for proper distribution of the death certificate, as follows:

1. send the original to the person who claimed the body, with a certified copy in the A-file on the decedent; or

2. if the decedent received an indigent's burial, place the original death certificate in the A-file.

## I. Autopsies

Each facility shall have written policy and procedures to implement the provisions detailed below in this section.

1. the facility chaplain shall be involved in formulation of the facility's procedures;

2. because state laws vary greatly, including when to contact the coroner or medical examiner, the

respective ICE Office of Chief Counsel shall be consulted; and

3. a copy of the written procedures shall be forwarded to the ICE Office of Chief Counsel.

The written procedures shall address, at a minimum, the following:

1. contacting the local coroner or medical examiner, in accordance with established guidelines and applicable laws;

2. scheduling the autopsy;

3. identifying the person who shall perform the autopsy;

4. obtaining the official death certificate; and

5. transporting the body to the coroner or medical examiner's office.

   a. Who May Order an Autopsy
   The FBI, local coroner, medical examiner, ICE personnel or clinical medical/administrative health authority may order an autopsy and related scientific or medical tests to be performed in a homicide, suicide, fatal accident or other detainee's death, in accordance with established guidelines and applicable laws.

   The FBI, local coroner, medical examiner, ICE personnel or clinical medical/administrative health authority may order an autopsy or post-mortem operation for other cases, with the written consent of a person authorized under state law to give such consent (e.g., the local coroner or medical examiner, or next-of-kin), or authorize a tissue transfer authorized in advance by the decedent.

   b. Making Arrangements for an Autopsy
   Medical staff shall arrange for the approved autopsy to be performed by the local coroner or medical examiner, in accordance with established guidelines and applicable laws:

1) while a decision on an autopsy is pending, no action shall be taken that shall affect the validity of the autopsy results; and

2) local law may also require an autopsy for death occurring when the decedent was otherwise unattended by a physician.

3) Religious Considerations

It is critical that the Field Office Director, or designee, verify the detainee's religious preference prior to final authorizations for autopsies or embalming, and accommodate religious-specific requirements.