1               IN THE UNITED STATES DISTRICT COURT

2                  WESTERN DISTRICT OF TEXAS

3                     EL PASO DIVISION

4

5  IN RE:                      No. EP-19-MC-205-FM

6  AJAY KUMAR                  El Paso, Texas

7                         August 19, 2019

8

9                 EMERGENCY MOTION HEARING

10             EXCERPT:  TESTIMONY OF DOCTOR

11         BEFORE THE HONORABLE FRANK MONTALVO

12           UNITED STATES DISTRICT JUDGE

13

14

15  <u>APPEARANCES</u>:

16  For the Respondent  Christopher Benoit
                     Lynn A. Coyle
17                   Law Office of Lynn Coyle, PLLC
                     2215 N. Stanton
18                   El Paso, Texas 79902

19  For the Petitioner  Angelica Astrid Saenz
                     Manuel Romero
20                   Assistant United States Attorney
                     700 East San Antonio, Suite 200
21                   El Paso, Texas 79901

22

23

24     Proceedings recorded by stenotype.  Transcript produced by

25  computer-aided transcription.

13:45 1          MR. BENOIT:  Your Honor, the respondent calls the

2    doctor in this case to the stand.

3          THE COURT:  Very well.  And, Nalene, the physician is

4    going to be referred to as "Doctor" without using her name.

5    And at the end of the hearing, counsel will give you her

6    information, okay?

7          Please raise your right hand, ma'am.

8                          DOCTOR, SWORN

9          THE COURT:  Please be seated, ma'am.  If you would be

10   kind enough and pull the microphone down and speak directly

11   into the microphone at all times.

12         THE WITNESS:  Okay.

13         THE COURT:  Thank you.  Go ahead.

14                      DIRECT EXAMINATION

15   BY MR. BENOIT:

16   Q.  Good afternoon, Doctor.

17   A.  Good afternoon, sir.

18   Q.  You understand that we are here today to talk about the

19   application of a nasogastric tube to force-feed my client, Ajay

20   Kumar, correct?

21   A.  Yes.

22   Q.  And the application of nasogastric tubes, the simple

23   application is a painful and somewhat dangerous procedure; is

24   that right?

25   A.  It can be.

13:46 1    Q.   In fact, I think you have testified before that it can

2    result in serious complications if not done correctly, right?

3    A.   Yes, sir.

4    Q.   Those complications include perforation of the esophagus?

5    A.   Yes.

6    Q.   Perforation of the stomach potentially?

7    A.   Yes.

8    Q.   The tube, which I think you have described as about the

9    diameter of a straw; is that right?

10    A.   Yes.

11    Q.   That can go into the mouth, as opposed to down the

12    esophagus as it's supposed to?

13    A.   Yes.

14    Q.   And so that would require pulling the tube out, which can

15    be painful to the patient?

16    A.   Yes.

17    Q.   The tubes, in fact, in some instances can actually go up

18    into the brain?  Have you heard of that happening?

19    A.   I have heard of it, yes, sir.

20    Q.   And so if any one of these things happened that we just

21    talked about, that's something you would want to transfer

22    Mr. Kumar or any patient out of your facility to an emergency

23    medical facility; is that right?

24    A.   Yes.

25    Q.   And so given all those possibilities, wouldn't you say that

13:47  1   it would be preferable to conduct a procedure like this in a

2   facility that can deal with the potential contingencies that

3   may come up?

4            MS. SAENZ:  Objection, relevance, Your Honor.

5            THE COURT:  Overruled.

6   A.   No.  This could be done at our facility.

7   Q.   But you agree with me that if those contingencies came up,

8   you may have to rush the patient to another facility that has

9   different treatment options, right?

10  A.   If there was a perforation, yes, sir.

11  Q.   Now, we are here today -- and you have actually already

12  conducted that procedure on Mr. Kumar, right?

13  A.   Yes.

14  Q.   When you conducted the procedure on Mr. Kumar, you had six

15  guards ready to restrain him, correct?

16           MS. SAENZ:  Objection, relevance.

17           THE COURT:  Overruled.

18  A.   Yes, that's part of any procedure when we are doing this.

19  Q.   And prior to conducting this procedure, he was in medical

20  isolation, right?

21  A.   He was located in our medical housing unit, sir, in our

22  large room.

23  Q.   But before you brought him into the large room, he was in

24  an individual room; is that right?

25  A.   Not on that day, no, sir.

13:48 1    Q.   That's your testimony today?

2    A.   Yes.

3    Q.   But you brought -- you are saying that when you conducted

4    the procedure, he was in a larger room, correct?

5    A.   Yes.

6    Q.   And in this larger room, there were other hunger strikers

7    who were also on a hunger strike, correct?

8    A.   Yes.

9    Q.   And you conducted the procedure in front of those other

10   hunger strikers; is that right?

11   A.   They were also present in the room, yes.

12   Q.   They were able to watch the procedure, correct?

13   A.   Had they sat up from their beds, yes, they could have seen

14   the procedure, but they were all laying down.

15   Q.   Did you speak with any of the other hunger strikers while

16   you conducted this procedure on Mr. Kumar?

17   A.   While I was conducting his procedure, no, sir.  I was

18   focused on Mr. Kumar.

19   Q.   And, in fact, you didn't conduct the procedure; you

20   actually have nurses do it; is that right?

21   A.   We have -- we have a setup that we use when we are

22   inserting NG tubes, and so I was present there, but it was an

23   actual nurse who inserted the tube.  And I verified placement,

24   correct placement.

25   Q.   And, you know, we have had a chance to look over some of

13:49 1    the medical records.  My understanding is that the nurse had to

2    insert the tube two times before she was able -- she or he --

3    was able to get it right; is that correct?

4    A.  It's not that this nurse was unable to get it right.  It's

5    the fact that the tube actually coiled in the esophagus, which

6    I was able to verify through an x-ray, and so we had to repeat

7    the procedure.

8    Q.  And the procedure was repeated three times before it was

9    done correctly, right?

10    A.  It was the third time that it was inserted into the stomach

11    and did not coil.

12    Q.  In both nostrils, correct?

13    A.  Yes.  Once we moved to the right nostril, that's when we

14    were able to get it through the esophagus without any -- any

15    issue.  It was able to enter -- insert the stomach.

16    Q.  Did Mr. Kumar, when you conducted this procedure, look

17    pained, like he was in pain?

18    A.  He looked uncomfortable, yes.

19    Q.  And what kind of bleeding did you see occur during the

20    procedure?

21    A.  Something that we commonly see when we are inserting a

22    nasogastric tube is we will have some bleeding through the

23    nostril.

24    Q.  And, in fact, that bleeding has continued over the last

25    several days; is that right?

13:50 1    A.   It usually tends to irritate the nostril, so we will have

2    minimal bleeding or we will see some presence of some dried

3    blood, yes.

4    Q.   And it creates irritation all the way down the esophagus,

5    correct?

6    A.   It can cause irritation, yes, sir.

7    Q.   And, in fact, I think as you testified before, the

8    introduction of a foreign object like this into the esophagus

9    does increase the risk for infection, right?

10   A.   Yes.

11   Q.   And one of the other complications you mentioned before was

12   that you can actually -- the tube could go down the windpipe as

13   opposed to the esophagus, right?

14   A.   That's a potential complication, yes, sir.

15   Q.   And if that were to happen, the patient could end up with

16   potential pneumonia, right?

17   A.   Yes.

18   Q.   Now, the bottom line is this is a serious invasive

19   procedure.  Would you agree with me on that?

20   A.   I wouldn't call it a serious invasive procedure.  I don't

21   think it is comparable to other things that we call serious and

22   invasive.

23   Q.   Well, for a procedure where you are not putting the patient

24   to sleep, would you agree with me that it is pretty invasive?

25   A.   It is an invasive procedure, yes.

13:51 1    Q.  One that you wouldn't be recommending unless you felt like

2    Mr. Kumar's condition was life-threatening; is that right?

3    A.  Yes.

4    Q.  So let's talk a little bit about Mr. Kumar's condition, and

5    we have had a chance to look over some medical records that I'm

6    sure you are familiar with?

7    A.  Yes.

8    Q.  So are you familiar with all of the records that have been

9    approved in this case from -- from -- from the Immigration &

10    Customs Enforcement?

11    A.  I believe so.  I haven't seen what was provided to you-all,

12    but I am very familiar with his medical records.

13    Q.  Okay.  A couple of things that struck me as I look through

14    the records, and I think you would agree with me, Mr. Kumar has

15    always been alert and oriented during his time in the medical

16    unit; is that right?

17    A.  Yes.

18    Q.  Never had a problem communicating with him?

19    A.  No.  It's -- I mean, it's limited English, but he always

20    answers my questions, and we have used interpreters.

21    Q.  And your staff uses interpreters, right?

22    A.  Yes.

23    Q.  The medical records stated that he was cooperative and

24    respectful, cooperative with treatment, calm and relaxed.

25    Would you agree to that characterization of my client?

13:52 1    A.   Yes.

2    Q.   And you are not a mental health expert, correct?

3    A.   No.

4    Q.   But you make sure that you have social workers present in

5    providing mental health evaluations during -- while he is in

6    the medical unit?

7    A.   Yes.

8    Q.   And in the medical records, I noted that as recently as

9    August 14, the day that the procedure took place in this case,

10   a social worker did do an evaluation -- a mental health

11   evaluation -- of my client.  Do you recall that?

12   A.   I asked her to, yes.

13   Q.   She found that he did not have any suicidal ideation,

14   right?

15   A.   That's correct.

16   Q.   That he denied symptoms of depression and anxiety?

17   A.   I do believe he is depressed.

18   Q.   Okay.  But that -- but do you have anything -- do you have

19   any reason to believe that his denial -- that he did not deny

20   depression and anxiety or symptoms of that?

21   A.   I am not sure if he denied it to her that day, sir.  I just

22   know what I have clinically observed.

23   Q.   But you are not a mental health expert, right?

24   A.   No.

25   Q.   Okay.  My understanding is that she also did not find him

13:53 1    in his hunger strike to be a, quote, symptom of a mental

2    illness; is that fair?

3    A.   That she stated that?  Yes.

4    Q.   Yes.  Okay.  And she stated that his attention, his

5    concentration, and his memory were all within normal limits

6    when she did her evaluation, right?

7    A.   Yes.

8    Q.   So he has been fully competent to make decisions regarding

9    his medical treatment, correct?

10   A.   Yes.

11   Q.   And at no point has he ever consented to nutritional

12   treatment?

13   A.   Correct.

14   Q.   At no point has he ever consented to receiving food?

15   A.   Correct.

16   Q.   And he has informed you that he is doing so on the basis of

17   principle, right?

18   A.   He is doing so because he wants to be released from

19   custody.  That's what he has stated to me numerous times.

20   Q.   But he is not suicidal?

21   A.   He is not suicidal.

22   Q.   And he is fully competent and rational to make that

23   decision, right?

24           MS. SAENZ:  Asked and answered, Your Honor, objection.

25           THE COURT:  Overruled.

13:54 1  A.  Yes.

2  Q.  Now, I do want to talk a little bit about his condition and

3  particularly about the condition that you testified to in your

4  declaration to this court on August 14, 2019, just last week.

5  I understand from that declaration that you felt that this

6  condition was life-threatening.  I think you said you felt like

7  you had to initiate force-feeding within 48 hours?

8  A.  Yes.

9  Q.  Because you were worried about his life?

10  A.  Yes.

11  Q.  And from your -- you provided a few metrics, so I wanted to

12  go through some of those medical metrics.  One of the metrics

13  that you discussed in your testimony previously was that body

14  weight loss as a percentage of total body weight is a key

15  factor in determining kind of the health of a hunger striker;

16  is that right?

17  A.  Yes.

18  Q.  And I understood from your testimony that loss of 16

19  percent is where there's a heightened risk of organ failure,

20  right?

21  A.  Anything over 10 percent, but anything over 18 is very

22  alarming and has been shown to be a point where we see

23  irreversible organ damage.

24  Q.  And I believe I recall you saying that between 16 and 18,

25  that's where you start to get concerned about irreversible

13:55 1  organ damage?

2  A.  I said he had 16, but it's -- there's no set number.  It's

3  anywhere from 10 to 18.  He currently has 16 percent body

4  loss -- weight loss.

5  Q.  But 18 is kind of your no turning back number.  Wouldn't

6  you agree with me on that?

7  A.  It's not mine.  It's what research has shown, and it's one

8  of the parameters that we use.

9  Q.  And as of last week, I understand that Mr. Kumar, in the

10  medical notations, had lost about 14 pounds; is that correct?

11  A.  Last week?

12  Q.  Yes, as of August 13th.

13  A.  I don't know what he was at August 13.  I know what he is

14  at right now, and that's 22 pounds, and he's at a 16 percent

15  weight loss.

16  Q.  Well, I -- you know, we are here to talk about a

17  declaration that you signed last week, so I want to really

18  focus on that to begin with.  My understanding of that

19  declaration is you said something about 17.7 pounds, is what

20  his weight loss was.

21  A.  That would make sense, about a week ago, yes.

22  Q.  Okay.  And my understanding from the medical records is it

23  was, in fact, at 14 pounds?

24  A.  I would need to see those medical records.

25  Q.  Sure.  Would it refresh your memory to look at some of

13:56 1 those records?

2 A. Yes.

3       MR. BENOIT: Your Honor, may I approach?

4       THE COURT: Of course.

5 Q. Do you recognize this document?

6 A. Yes. Yes, I do.

7 Q. And this is a notation by one of your nurse practitioners

8 at 5:25 p.m. on August 13; is that correct?

9 A. Uh-huh, yes.

10 Q. And I just want to make a note that on the front page where

11 it states "hunger strike" -- do you see that?

12 A. Yes.

13 Q. There's total weight loss in pounds. It says 14.6.

14 A. That's an error, because if you look below on his vital

15 signs that were obtained that day, it shows that that day, on

16 August 18, he weighed 18 -- 118 pounds -- 118.2. His initial

17 weight, July 11, at the start of his hunger strike, he weighed

18 in at 139.6 pounds. So the math on top was never updated. But

19 if you look to the correct -- the vital signs that were

20 obtained on August 13, that does indicate 118, which would put

21 him at about a 20-pound weight loss.

22 Q. You would agree with me that this document says that he

23 came in on August 13 at 14.6 pounds weight --

24 A. No, I would say that the vital signs -- they are all

25 clearly just on the bottom. That's exactly what he -- what his

13:58  1  vital signs -- that day and time, at 4:00 p.m. on August 13, he

2  weighed in at 118.2 pounds.

3  Q.  That's correct.  And we don't have anything on this

4  document telling us what his body weight was at the time that

5  he started the hunger strike, do we?

6  A.  If you look down our records where all these encounters

7  are, sometimes they put it, sometimes they don't, but we have

8  it, and we have exactly what he weighed in on, and that's 139.6

9  pounds.  I actually have a copy of that on my desk.

10  Q.  We will give your attorneys an opportunity to address that.

11  But you would agree with me that this notation on August 13

12  says 14.6 pounds?

13  A.  I think what's most important is that he weighed in at 118.

14  She did not update his weight loss for that day.  But it is

15  updated what he weighed that specific day under -- under his

16  vital signs.

17  Q.  And you can't make that note -- you can't make that

18  calculation unless you have the original weight; is that right?

19  A.  Yes.  Because she would compare it to the initial weight

20  starting his hunger strike.

21  Q.  And we don't have that in front of you, right?

22  A.  On this one that you gave me, no.

23  Q.  Okay.  Now, I understand that Mr. Kumar also had to -- I

24  understand that on August 3, Mr. Kumar was sent to the

25  hospital; is that right?

13:59 1    A.  Yes.

2    Q.  And at that time he was sent to the hospital because of

3    dizziness, high ketones, and some pain in his right flank; is

4    that correct?

5    A.  The reason why he was sent out was because he was reporting

6    right flank pain.

7    Q.  But he was also reported as having dizziness and high

8    ketone levels, correct?

9    A.  On that specific day, I'm not sure, but he did always

10   experience -- he always reported dizziness.  I can't recall his

11   ketone level that specific day.  But he was sent out because he

12   was reporting severe right flank pain.

13   Q.  And a ketone rate of four plus is pretty severe.  Would you

14   agree with me on that?

15   A.  Any -- we -- the highest number it could read is four plus,

16   and so any level of ketones is going to show some -- tells us

17   about hypovolemia or dehydration.  But the reason why he was

18   sent to the hospital was specifically because he was in a lot

19   of pain.

20   Q.  And what was your concern about that pain?

21   A.  Because of the location that he was reporting the pain, it

22   was possible that he -- we needed to rule out a kidney stone,

23   which can happen from dehydration, or potentially an ulcer in

24   the stomach from not eating.

25   Q.  And when -- when he was sent, he agreed to receive all

14:00 1  necessary treatment at the ER; is that correct?

2  A. When we sent him, he didn't tell us if he was going to

3  accept any type of treatment at the hospital. We just knew we

4  had to send him because I was worried about the pain. At the

5  hospital, he then denied any medical -- any medications or any

6  further intervention. He did allow a CT abdomen that was done

7  that day at the hospital.

8  Q. Well, he accepted treatment of an IV supplement, correct?

9  A. Of IV fluids, yes.

10  Q. Right. And he also agreed to pretty extensive imaging at

11  the hospital. Would you agree with me?

12  A. Yes, he agreed to a CT scan.

13  Q. That imaging was imaging that you were not able to do in

14  your facility at the processing center, correct?

15  A. Which is exactly why I wanted him sent out, yes, sir.

16  Q. And when that imaging came back, it was found that he may

17  have had a mild colon infection, correct?

18  A. Coli- -- yes, sir, colitis.

19  Q. And that he had very high glucose; isn't that right?

20  A. I don't remember that.

21  Q. Would you agree with me that 359 milligrams per deciliter

22  is pretty high in terms of glucose reading?

23  A. Yes.

24  Q. And when he came back, that was the issue that the doctors

25  had flagged, that he had high glucose and they were concerned

14:02  1  about his glucose?  Will you agree with me?

2  A.  I wasn't aware of that.  I'm not even sure what type of IV

3  fluids the hospital gave.

4  Q.  Have you taken a look at the records from Sierra Medical?

5  A.  I have.  I have seen them before.  I looked at them to see

6  what the diagnosis was for his abdominal pain.

7  Q.  Okay.  Would it help and refresh your memory to take a look

8  at those records again?

9  A.  Yes.

10        MR. BENOIT:  Okay.  May I approach, Your Honor?

11        THE COURT:  Yes.

12  Q.  Do you recognize these records, Doctor?

13  A.  Yes.

14  Q.  I am going to ask you to move towards page -- at the top,

15  there is a handwritten notation, 1 of 20, 2 of 20.  Do you see

16  that?

17  A.  Yes, sir.

18  Q.  I'm going to ask you to go to page 9 of 20, please.

19  A.  Okay.

20  Q.  There is a glucose reading there.  What is the glucose

21  reading?

22  A.  359.

23  Q.  So you previously said that would be a glucose reading that

24  would concern you, correct?

25  A.  That's a high glucose reading, yes, sir.

14:03 1    Q.  Glucose spikes like that generally when glucose is entered

2    into the system, correct, or dextrose?

3    A.  Dextrose in itself has the equivalent of about 12 to 20

4    grams of sugar, so it's not much.  Dextrose provides us with

5    very little sugar, actually.

6    Q.  Well, the only sugar entering Mr. Kumar's body in the

7    previous 20 -- 15 to 20 days was from IVs that you were

8    administering, correct?

9    A.  Yes, we would need to know how much dextrose he has

10   received.  Dextrose in itself, especially one bag or one liter,

11   could not raise him to 359.  What can raise him to 359 is

12   colitis, which he was found to have.  That's an inflammatory

13   response of the intestines, which can possibly be from

14   infection.  Any source of infection, any source of inflammation

15   will increase the glucose level on the body.

16   Q.  Well, Doctor, if we look at page 10 of 20, that is not the

17   conclusion that the physician at Sierra Medical came to,

18   correct?  They were concerned about other issues.  They were

19   concerned about his high sugar level and potentially being

20   onset of diabetes.

21   A.  Let me -- let me read this.  You said to look at page 10?

22   Q.  10 of 20, yes.

23   A.  Okay, I'm going to just explain a little bit of this.

24   So -- well, I think it is --

25   Q.  I have to ask you a question first.  So if you want to

14:05  1   explain it, you will have an opportunity to do so when your

2   counsel asks you questions, okay?

3           But I just want to make clear that the doctor in no

4   way in this section at Sierra Medical made an indication that

5   he thought the high blood sugar was a result of colitis.  Do

6   you see that anywhere here?

7   A.  Actually, that is incorrect, sir.  So he does mention here

8   a recommendation for an ultrasound due to superior mesenteric

9   vein.  So what happens is that is what's affected in the

10  intestine, which is very painful, which is -- which causes the

11  colitis.  So they do mention twice the mesenteric vein.

12          They are also noting, as they need to -- and this is a

13  physician who is not familiar with our detainee -- he is saying

14  this person also has a blood glucose of more than 200, which we

15  have to ask any patient coming into a hospital above 200, does

16  this patient have diabetes and perhaps doesn't know it.  So it

17  needs to be brought up to the attention.  But, most

18  importantly, is the fact that this physician correctly pointed

19  out something might be going on with the superior mesenteric

20  vein, which would cause his abdominal pain, which happens from

21  hypovolemia, which also leads to colitis, which he was found to

22  have, and that is a diagnosis that they did diagnose that day

23  in the hospital.

24  Q.  Doctor, this doctor does not make any connection between

25  the high blood pressure and the colitis or the issues with the

14:06 1  need for scanning of the superior mesenteric vein.

2  A.  If this doctor was concerned about diabetes, like I think

3  you are saying, insulin would have been given.

4  Q.  I'm asking a very simple question.

5          THE COURT:  Wait, wait, wait.  Stop.  No, let her

6  finish.

7          Back to you, ma'am.

8  A.  If this physician was concerned, as much stress as you are

9  putting with this 300 -- or plus 300 of glucose, then insulin

10  would have been given.  And an A1C would have been ordered.

11  That is standard practice from a physician at a hospital with

12  any patient above 200.  It's just what we do automatically.

13  This was not done in this individual.  He is truly taking a

14  look at a CT abdomen and more concerned about a mesenteric vein

15  ischemia.  But he does mention the 300 because we have to say,

16  Hey, maybe this patient has diabetes.  Let's pay attention to

17  the 300.  But if it was truly a concern, I think in this case

18  he knows and the patient clearly denies any history of

19  diabetes.  Then there was no further medical intervention to

20  chase after the glucose of 300.

21  Q.  Doctor, when Mr. Kumar returned to your facility, there was

22  no notation made of his high blood sugars in the medical

23  record; is that right?

24  A.  So if you were -- if we were able to pull up the next

25  encounter, we check his sugar every single day.  He allows us

14:08 1    to do that.  So we would have had to show that he then had a

2    normal glucose, or else I would have addressed the high

3    glucose.

4    Q.  And do you recall ever addressing high glucose when he came

5    back to your care?

6    A.  No, which means he had to have had a normal glucose.

7    Q.  Doctor, something else that I noted from your declaration

8    was that you put a lot of stress on a blood urea nitrogen

9    levels or BUNs.  Do you recall that?

10   A.  Yes.

11   Q.  And that generally, BUN -- normal BUN is somewhere

12   between -- I think your declaration said between 9 and

13   20 milligrams per deciliter.  I think I have seen in the

14   literature 7 to 21.  Does that sound right to you?

15   A.  Yes.

16   Q.  And your concern was that on August 4, he had -- I believe

17   in your declaration you specifically cited to August 4 as a

18   time when his BUNs were lower than you would like to see.  Do

19   you recall that?

20   A.  I don't have that in front of me, but he has been found

21   multiple times to have lower BUN creatinine ratio.

22   Q.  And I just want to make sure I understand, in paragraph 6

23   of your declaration, you stated that on August 4, his results

24   returned with abnormal blood urea nitrogen and creatinine ratio

25   levels.  This test measures the amount of nitrogen in the

14:09 1    blood.  Normal levels are 9 to 20.  And Mr. Kumar's BUN level
2    was 6, suggesting liver disease or damage due to decrease in
3    the formation of urea and malnutrition.
4              That's what you stated.  Do you stand by that?
5    A.  Yes.
6    Q.  But the hospital, Sierra Medical, also conducted a blood
7    analysis or a urinalysis.  So it would have been a urinalysis,
8    right?
9    A.  They probably did both.
10   Q.  And in the hospital's records, they indicated that his BUN
11   levels were actually closer to 9 milligrams per deciliter?  Do
12   you recall seeing that?
13   A.  No.  But I'm looking.
14   Q.  Okay.  I will direct your attention --
15   A.  Yes, it's here.  It's on page 5.
16   Q.  It's on page 5.
17   A.  Uh-huh.
18   Q.  So, in fact, just one day earlier or even maybe a half day
19   before the date that you mentioned in your declaration, his
20   BUNs were significantly higher and within normal ranges,
21   correct?
22   A.  Well, so when he arrived, he was given two liters of NS
23   fluid.  It immediately brings up the number easily two to three
24   points per liter given.  So then when they conducted these
25   tests, he was found to have a BUN of 9.

14:10 1    Q.  They conducted these lab tests to make -- to assess his

2    entire body function, right, at the hospital?

3    A.  They are routine labs that we order on everyone.  Everyone

4    is going to get a CBC and a CMP, which is where you get the BUN

5    number.

6    Q.  And this lab indicates that his BUN number was at 9,

7    correct?

8    A.  Yes.

9    Q.  Now, last Friday, you were asked about some of the medical

10   professional standards for force-feeding.  Do you recall that?

11   A.  Yes.

12   Q.  And as I recall, you agreed that the American Medical

13   Association is a member of the World Medical Association?

14   A.  Yes.

15   Q.  And that they set the professional standards for physicians

16   here in the United States; is that correct?

17   A.  Yes.

18   Q.  And you would agree with me that medical standards don't

19   change depending on who your employer is, correct?

20   A.  Yes.

21   Q.  And you also testified that you were aware of the medical

22   association's Declaration of Malta regarding hunger strikers?

23   Do you recall that?

24        MS. SAENZ:  Objection, relevance, Your Honor.

25        THE COURT:  Overruled.

14:11 1    A.   Yes.

2    Q.   And the Declaration of Tokyo?

3    A.   Yes.

4    Q.   And these are considered, essentially, the consensus by the

5    World Medical Association, adopted by the American Medical

6    Association, the consensus regarding medical ethics with

7    regards to hunger strikes.  Would you agree with me on that?

8    A.   Yes.

9    Q.   And I believe you were aware that the AMA has taken the

10   position that when a prisoner refuses nourishment and is making

11   unimpaired and rational judgment, he should not be fed

12   artificially; is that correct?

13   A.   That it states that?

14   Q.   Yes.

15   A.   Yes.

16   Q.   And it is for this reason that you have stated that it's

17   essentially accepted medical standard outside of the detention

18   context in our community that no doctors would conduct

19   involuntary force-feeding, correct?

20   A.   Yes.

21   Q.   You said that no one at the hospital would do it, right?

22   A.   No.

23   Q.   And so you are here asking the Court to permit you to do

24   something that is not the accepted medical standard in your

25   field, right?

14:12 1    A.   Because this is a detainee that's in custody.   And there's

2    a different policy.   And I would need to request a court order

3    to ever consider something like this.

4    Q.   But, on Friday, I heard you testify that you don't think

5    doctors in the private medical sphere here in El Paso would

6    even comply with the court order?

7    A.   We -- we can't do that.   In the private world, which is

8    very different from being in a detention center, there's

9    different -- there's different policies.   And we don't do that

10   in the private section.

11   Q.   But your medical standards, your medical ethics, these are

12   not things that change depending on who your employer is,

13   right?

14           MS. SAENZ:   Asked and answered, Your Honor.

15           THE COURT:   Sustained.

16   Q.   Well, let's take a look, then, at the ICE protocols that we

17   have here.   You have referred several times to the hunger

18   strike protocol.   I think that shows up in some of the medical

19   records, correct?

20   A.   Yes.

21   Q.   And that is a protocol that comes from the Immigration &

22   Customs Enforcement Performance-Based National Detention

23   Standards that were revised in 2011, correct?

24   A.   Yes, revised in 2016, but yes, that's correct.

25   Q.   Revised again in 2016?

14:13 1    A.   Yes, sir.

2    Q.   And I believe the hunger strike protocol is referred to as

3    protocol 4.2, right?

4    A.   Yes.

5    Q.   You are very familiar with those standards, right?

6    A.   Yes.

7    Q.   Those standards were created, essentially, to guide medical

8    professionals like yourself who are working for ICE and to make

9    sure that medical care is provided humanely, correct?

10   A.   Yes.

11   Q.   But balancing the institutional interests of holding civil

12   detainees?

13   A.   Yes.

14   Q.   These -- what we will call PBNDS, the standards, they guide

15   what you can and cannot do in providing medical care to

16   detainees, correct?

17   A.   Yes.

18   Q.   And we stated earlier that on August 14, in your

19   declaration, you asked for involuntary force-feeding because it

20   was life-threatening?  Mr. Kumar's condition in your

21   estimation, in your medical judgment was life-threatening,

22   right?

23   A.   Yes.

24   Q.   I believe I heard you testify that you were concerned that

25   death could happen the next day if action wasn't taken, right?

14:14 1    A.   It was possible, yes.

2    Q.   That's what you were concerned about when you asked for the

3    order?

4    A.   Yes.

5    Q.   These PBNDS standards also have standards with regards to

6    life-threatening situations, do they not?

7    A.   Yes.

8    Q.   And I want to refer you to standard 4.7.  Are you familiar

9    with that standard in PBNDS?

10   A.   Let me look for it.  Regarding the medical documentation of

11   detainee monitoring?

12   Q.   Regarding terminal illness advanced directives and death.

13   A.   I don't know the exact number, but, yes, I'm familiar

14   overall.

15   Q.   Well, and I can -- if the Court may, I can approach and

16   provide you with that standard.

17   A.   Yes, I have seen that, yes.

18   Q.   Do you recognize the standard, Doctor?

19   A.   Yes.

20   Q.   In Section 5A on the second page, the PBNDS standard states

21   that you as the clinical medical authority shall arrange the

22   transfer of a detainee to an appropriate off-site medical or

23   community facility if appropriate and medically necessary if a

24   medical condition is life-threatening, correct?

25   A.   Yes.

14:16 1   Q.  You have not asked the Court to do that, have you, in this

2   circumstance?

3   A.  Asked the Court to move him to a hospital?

4   Q.  Well, let me ask it differently.  You have not sought to

5   transfer Mr. Kumar to a hospital for his life-threatening

6   condition, correct?

7   A.  Aside from August 3?

8   Q.  Right.

9   A.  Yes.  That's correct.

10   Q.  Well, I mean, you have asked the Court to order the

11   involuntary force-feeding of my client because you believe it's

12   life-threatening, right?

13   A.  Because I believe what he needs for his medical condition

14   is to be fed, so that is why I requested a court order so that

15   I would have the ability to feed him.

16   Q.  Well, we have heard numerous times today you testifying

17   that you felt his condition was life-threatening and that he

18   may die the next day, right?

19   A.  I cannot determine when he would die.  What I knew is that

20   within the next 48 hours, it was my recommendation that he

21   needed to be fed.

22   Q.  Well, you said that because it would be a life-threatening

23   condition, right?

24   A.  Because it can be.  Starvation, yes, sir, it can be.

25   Q.  Well, not just starvation.  I mean, starvation is a

14:17 1   condition of malnutrition. But his specific medical condition,

2   when you asked for this order, your testimony was you were

3   concerned that it was life-threatening?

4   A. Yes, that's true.

5   Q. And you have not sought to move him to an outside community

6   health facility, have you?

7   A. The hospital --

8   Q. Have you?

9   A. No. Because the hospital would not be able to force-feed.

10   So even if I were to have sent him out, as I have before, he

11   would not allow the treatment that he needs. So I had to ask

12   for a court order because what I know he needs would not even

13   be able to be done in a hospital.

14   Q. Have you spoken to any hospitals regarding Mr. Kumar's

15   condition?

16   A. Yes, yes, I have spoken to about three hospitals.

17   Q. None of that's before the Court today, is it? The

18   conversations or opinions from other hospitals regarding what

19   they would and wouldn't do?

20   A. No.

21   Q. And that is what the ICE standard requires, right, that you

22   send somebody who is in a life-threatening condition out of a

23   detention facility because, as you said earlier, you don't have

24   the facilities necessary to deal with emergencies that he may

25   be confronting, correct?

14:18 1   A.  Well, every medical emergency is different, sir.  We have

2   what we need in this facility to handle his medical emergency.

3   But every medical emergency is very different.  And in many

4   cases, it requires hospitalization.  In this case, the hospital

5   cannot do for my patient what we could do for him at the

6   facility.

7   Q.  If you had a detainee who had a heart attack, you would

8   send him to an outside facility?

9   A.  Absolutely.

10   Q.  Do you have any idea how much it costs to administer

11   nasogastric feeding to Mr. Kumar?

12   A.  Not at all.

13   Q.  So you don't come with any of that information for us, do

14   you?

15   A.  Financial cost, no, sir.

16   Q.  Mr. Kumar has made clear to you that if ICE chose to

17   release him, he would start eating again, correct?

18   A.  Yes.

19   Q.  Is it your understanding that the agency has the discretion

20   to release him?

21        MS. SAENZ:  Objection, relevance, Your Honor.

22        THE COURT:  Sustained.

23   Q.  Doctor, have you considered at any point sending Mr. Kumar

24   to an outside medical facility for his condition since

25   August 14 of 2019?

14:19 1    A.   No.

2                 MR. BENOIT:  Pass the witness, Your Honor.

3                 MS. SAENZ:   Thank you, Your Honor.

4                      CROSS-EXAMINATION

5    BY MS. SAENZ:

6    Q.   Doctor, approximately how long has Mr. Kumar been under

7    your care?

8    A.   42 days.

9    Q.   And how long has his hunger strike lasted to date?

10   A.   42 days.

11   Q.   And approximately how many meals has Mr. Kumar missed to

12   date?

13   A.   Approximately 128 meals.

14   Q.   And are you familiar with the effects of a hunger strike on

15   the body?

16   A.   Yes.

17   Q.   And please explain what those effects are.

18   A.   So the effects of the starvation are going to be

19   determinate on how many days somebody has been undergoing

20   starvation.  In Mr. Kumar's case, he's -- he's hydrated, so he

21   would drink water, and he would -- we would provide IV fluids,

22   which he would allow us to do so.  So he's remained well

23   hydrated.

24                 Now, however, he has always refused all food,

25   including, you know, Boost when we have offered him some.  The

14:21 1  body needs a source of energy in order to sustain life.  It

2  changes throughout the course of days of starvation.  But,

3  specifically, after 20 days, literature has shown that, at that

4  point, the body starts using a different source of energy for

5  life and to keep organs healthy.  So usually after 20 days, we

6  see muscle breakdown, which the body then converts to a form of

7  energy.  Mr. Kumar, at the time of the requested declaration,

8  was at day thirty-something.  I can't recall exactly.  But at

9  this point, he is at 42 days.  So based off what we know from

10  starvation, especially at this amount of length of days, he's

11  definitely in danger.  We have muscle breakdown, which includes

12  cardiac muscle, which has been a concern for me with him is his

13  heart and potential irreversible organ damage, usually

14  affecting the kidneys.

15  Q.  And would you say that you have seen these effects on

16  Mr. Kumar?

17  A.  Yes.

18  Q.  Prior to seeking court orders, how would you describe

19  Mr. Kumar's physical condition, physical appearance?

20  A.  He had become very weak.  He had absolutely no energy.  He

21  was always seen laying in bed sleeping.  I rarely saw him

22  communicate.  He was always pleasant and respectful, but just

23  didn't communicate much.  And, again, I would never even see

24  him sitting down.  He was just laying down.  I never saw him

25  ambulating.  He appeared very sad and depressed.  And that was

14:23 1   definitely deteriorating prior to the court order.

2   Q.  And have you seen a change in Mr. Kumar since you received

3   the first court order?

4   A.  From the IV fluids?

5   Q.  Yes, ma'am.

6   A.  From the IV fluids, I definitely saw a change in his actual

7   vital signs, his blood pressure, which was previously very low,

8   definitely improved into much more stable blood pressure

9   readings.  His urinalysis that we do daily showed a decrease in

10   ketones.  He was previously having ketones almost daily, if not

11   daily.  And that resolved after the fluids.  I saw a

12   significant difference once he was provided with the actual

13   meal replacement supplementations.  I now for the first time

14   see him ambulating in his room, going outside.  Yesterday, I

15   observed him sitting down, talking to the guys.  He looks much

16   better, in my opinion, definitely looks much more stronger.  I

17   observed his gait yesterday as he was going to the restroom.

18   And he just walks better and just seems much more stable.

19   Q.  Now, we are here today to provide the Court with a status

20   as to the two orders that have been entered.  As of today, what

21   is your medical recommendation as to -- as to both of those

22   orders?

23   A.  That they remain in place.

24   Q.  So I would like to discuss the medical care that Mr. Kumar

25   has received during his hunger strike while under your care.

14:24 1    First, can you tell us where the detainees who are on a hunger

2    strike, where are they generally housed?

3    A.  We keep them in an area inside our -- inside our clinic,

4    called the medical housing unit.  It's a very large room with

5    six beds, so we have them together.

6    Q.  And by being placed in that area, what kind of access do

7    the hunger strikers have to you?

8    A.  It's -- it's definitely easier to monitor them.  We are

9    able to see them 24 hours a day.  There's an area right next to

10   their room of nurses, so it's a nurses' station, it is a glass

11   wall, so we can see them at all times.  So we are able to

12   closely monitor and observe them, make sure that they are safe.

13   Q.  And do you have a staff that assists with monitoring the

14   medical housing unit?

15   A.  Yes.

16   Q.  And besides yourself, what other personnel is involved with

17   this?

18   A.  So we have nurses that monitor them daily and provide these

19   encounters.  We have nurse practitioners.  There's at least one

20   that has to round on them every day.  We have behavioral health

21   people that do the mental evaluations on them and are available

22   if any of them would like to speak to somebody, a mental health

23   provider.  That's all that we have there.

24   Q.  When Mr. Kumar first came into your care, what sorts of

25   evaluations did you do on Mr. Kumar?  Specifically, what kind

14:26 1  of tests were run on him?

2  A.  So we had to do a full medical evaluation -- medical and

3  mental evaluation.  So we do a screening for any chronic

4  medical conditions he may -- he may report or any use of

5  medications.  And then we do our own screening, which includes

6  blood work to check the thyroid and the glucose level and liver

7  and kidney function, and basically just to give us some sort of

8  a baseline on how healthy this individual is, so that we could

9  be able to monitor him throughout the course of the hunger

10  strike.  He gets an EKG done, and he gets urinalysis to check

11  the protein, and then he gets a full mental evaluation to look

12  for signs of suicide, suicidal ideations or depression or any

13  type of condition that would be causing this hunger strike.

14  Q.  And do you recall how soon after he came into your care you

15  asked for that first court order?

16  A.  I think it was about a week or two after he came to our

17  facility.

18  Q.  So my understanding, it was on July 24, so it would have

19  been about a week.  Why did you ask for a court order for

20  non-consensual hydration and medical exams at that point?

21  A.  I had been asking him to drink more water because we had

22  consistently seen ketone levels in the urine.  At that point,

23  it was safe to just assume that it was due to dehydration, so I

24  was just encouraging him to drink orally, so that he could have

25  a healthy -- a healthy volume state in his body.  But he

14:28 1  quickly deteriorated to like -- he had low systolic blood

2  pressures.  And, again, his urine consistently showed ketones,

3  so I knew he was dehydrated, and it was increasing -- the

4  amount of ketones was increasing, and his blood pressure kept

5  dropping.

6  Q.  Besides what you have already discussed, what are other

7  dangers of dehydration?

8  A.  Well, dehydration will lead to acute or chronic kidney

9  disease.  It puts a lot of strain on the heart because the

10  blood pressures tend to drop, so it's more stressful on the

11  heart.  It definitely leads to postural hypotension, so it is

12  dangerous when they stand up, they always report dizziness, and

13  they are definitely at a risk of fall.

14  Q.  And now that you have a court order, is Mr. Kumar

15  hydrating?

16  A.  Yes.

17  Q.  How is he hydrating?

18  A.  Usually on his own.  I always ask him to try to have at

19  least 2 liters, which is the recommended amount -- minimum

20  amount.  1.5 to 2 liters is what's recommended to keep healthy

21  kidney levels and blood pressures, and so I always try to

22  encourage him to hit the 2-liter mark so that we don't need to

23  provide any IV fluids.

24  Q.  And if IV fluids are provided, is anything else included in

25  that IV solution?

14:29 1  A.  We base the dextrose -- so it is usually normal saline.

2  But if they are found to have a glucose level less than 60 --

3  so if he is found to be in the 50s, only then would we provide

4  some dextrose, which provides a little bit of sugar in the IV

5  fluids to put him into a safe range.

6  Q.  Would IV fluids, even with the added dextrose alone, be

7  enough to sustain Mr. Kumar long term?

8  A.  No, there is no way we would be able to provide sufficient

9  caloric intake to sustain life.

10  Q.  Now, since obtaining the order for the non-consensual

11  medical exams, have you had a chance to run more labs and more

12  test results and more tests?

13  A.  We complete our weekly labs every Monday, so they were

14  obtained -- or at least they should have been obtained this

15  morning from him.  And we would get the newest values on

16  Wednesday.

17  Q.  So not talking about the ones that were taken today, but

18  the ones that you have been able to do since July, when that

19  first court order was entered, what would you say is the

20  general trend of those results?

21  A.  Improvement.  Improvement to his kidney -- his renal

22  function.  His urinalysis, which we -- he allows us to obtain

23  every day, have now shown they are negative for any ketones,

24  which is a really big deal.  He previously has had trace amount

25  of blood, and he doesn't have it.  So his urinalysis looks

14:31 1   completely clean, healthy, free of infection, free of any

2   ketones.

3   Q.  Why are these ketones a big deal, as you said?

4   A.  Because at this point, with how many days of starvation we

5   have, even if we properly hydrate him, which we have been, and

6   he's been doing so, we are still worried about muscle

7   breakdown.  And ketones is what comes out in the urine due to

8   muscle breakdown.  So we use that to let us know his state of

9   muscle breakdown.  That's really all we could go off.

10  Q.  During this time, what have been your observations of

11  Mr. Kumar's mental health condition?

12  A.  Since he has arrived, I believe that he has become more

13  depressed.  Like I said, he just appeared very sad to me,

14  irritated, maybe frustrated, very quiet.  I mean, he just slept

15  all day.  He didn't appear to have any desire to really

16  communicate with anybody.

17  Q.  And have you seen a change in Mr. Kumar since obtaining --

18  in his mental condition -- since obtaining either of those two

19  orders?

20  A.  I have.  Like I said, yesterday, I really paid attention to

21  him, watching how he was talking to the other guys.  He -- it's

22  the most I have ever seen him speak.  He was sitting down on

23  his bed, and he was talking to everyone.  And it was the first

24  time we really had such a full conversation.

25  Q.  When you communicate with Mr. Kumar, is that always

14:33 1  documented in the medical file?

2  A.  No.

3  Q.  Why not?

4  A.  Again, because a lot of times it is just like an informal

5  visit.  Every time I go to the facility, I always stop by and

6  see how they are doing.  I will look up on the most recent

7  vital signs for that day.  I will see how they are doing.  I

8  will ask them if they want any pain medication or how they

9  feel.  So I don't document all my informal visits with them.

10  But I try to see them every time I go to the facility.

11  Q.  When you examine Mr. Kumar, do you provide him with

12  information about how he is doing with perhaps results of his

13  lab work?

14  A.  Yes.  I will explain what I'm concerned about, why I'm

15  concerned about it, what I'm recommending to him.  Every

16  opportunity I get, I always try to encourage him to just drink

17  a Boost.

18  Q.  And what have you told him about those results?

19  A.  I have explained to him previously why I was going to, you

20  know, request.  Even when I was requesting for the IV fluids, I

21  made it very clear why, what the numbers were showing, what I

22  was concerned about, what I felt the solution needed to be for

23  him.  So I have explained, along the course of everything I

24  have done, why I'm doing what I'm doing.

25  Q.  Has Mr. Kumar told you why he is on a hunger strike?

14:34 1   A.  Yes.

2   Q.  And have you provided him with any alternatives to a hunger

3   strike?

4   A.  I have made it clear that I have nothing to -- no say with

5   his status or his deportation status.  But I have always

6   offered him the opportunity to drink three Boosts a day, which

7   would be breakfast, lunch, and dinner, and not remove the

8   hunger strike protocol.  So I have made it very clear that he

9   can remain on hunger strike and just drink three Boosts to keep

10  him somewhat healthier and more stable.

11  Q.  And is this an option that's given -- is this an option

12  that was given to Mr. Kumar before the placement of the NG

13  tube?

14  A.  Absolutely.

15  Q.  How often are you and your staff giving Mr. Kumar this

16  option?

17  A.  Every day.

18  Q.  Do you recall when the NG tube was placed?

19  A.  I believe it was August 14th.

20  Q.  Now, why wasn't this order for the NG tube at -- why wasn't

21  it requested at the same time that you requested the first

22  order for the non-consensual hydration and medical exams?

23  A.  Simply because I was trying to avoid any type of invasive

24  procedure.  And I was hoping that he would drink Boost on his

25  own.

14:35 1   Q.   In your medical opinion, what would have happened if
     2   Mr. Kumar had not received the involuntary nutrition?
     3   A.   As we have said before, death is always a possibility.   It
     4   is very hard to tell when that would occur, but I was very
     5   worried -- specifically with Mr. Kumar, I was very worried
     6   about his low blood pressure, so I was very concerned about the
     7   status of his heart.   My fear was that he would have an
     8   arrhythmia or a heart attack based off the starvation.
     9   Q.   What changes would you expect to see in Mr. Kumar's body if
    10   he continues to not receive enough nutrients?
    11   A.   He will continue to deteriorate, and I believe that every
    12   day is still a possibility of, you know, potential irreversible
    13   organ damage.   It is always difficult to determine what type of
    14   damage has already been done until an individual starts eating
    15   again.
    16   Q.   And how would you describe the effect on the body of not
    17   receiving enough nutrients?   Is there a way to describe how
    18   that itself presents in the body?
    19   A.   I think the most easiest way to explain it would be that
    20   the body basically eats itself.   It runs out of forms of energy
    21   to use.   And so at the very last state, especially in a very
    22   thin individual with very low fat reserves, it will turn to
    23   muscle to convert that into a form of energy to attempt to keep
    24   the brain and the heart alive.
    25   Q.   And would you say that that in and of itself is painful?

14:37 1  A.  Yes.  These individuals tend to really experience

2  generalized muscle aches, which Mr. Kumar has always complained

3  about.  These muscle aches occur from not only the malnutrition

4  and the lack of nutrients and the lack of protein and the

5  muscle breakdown, but you end up having -- it could lead to

6  tissue necrosis because of all the hypovolemia and the

7  malnutrition.  So that in itself tends to be very painful.

8  Q.  How much time is generally needed to see any effect of the

9  NG tube placement; in other words, how long before you see any

10  change in his condition?

11  A.  Clinically, my experience has been on a clinical

12  presentation, within two to three days, we see some

13  improvement.  Detainees usually or always tell me they feel

14  better.  On lab work, an improvement to different organ

15  systems, it takes about two weeks.

16  Q.  Now, you testified earlier about sending Mr. Kumar out for

17  some right flank pain.  Does Mr. Kumar have any other medical

18  issues that you have discussed with him, any other medical

19  concerns?

20  A.  I know that he has a history of a previous abdominal

21  surgery.  He has never been able to provide me with much

22  information about it.  But he has reported a previous abdominal

23  surgery.  However, he wasn't sure why it happened.  But I do

24  know that he must have had some sort of abdominal complication

25  in the past.

14:39 1    Q.  So I would like to talk a little bit about the placement of

2    the NG tube.  Were you physically present when it was inserted

3    into Mr. Kumar?

4    A.  Yes.

5    Q.  And why is that?

6    A.  I always make myself present to verify proper placement of

7    the NG tube.

8    Q.  You testified about it coiling on Mr. Kumar a few times.

9    Do you have an opinion as to why that may have happened in this

10   case?

11   A.  I have an opinion.  I have never seen that before, not in

12   the hospital when these were done when I was a resident and not

13   in the cases of the hunger strikes and the force-feedings that

14   I have worked with.  It was very interesting to me with his

15   case because the actual insertion itself went down smoothly.

16   He was very cooperative.  He swallowed, which we strongly

17   encourage, so that the tube will flow down smoothly.  I was --

18   I was right in front of him and I was observing that, and that

19   went down very well.

20        What seemed to happen was once it went down -- so we

21   measure the length of tape we are going to need based off

22   everyone's body.  We mark the tube so we know when we

23   anticipate that we have hit the stomach.  We noticed with him

24   that, after a certain point, it seemed to get stuck.  So we

25   stopped, and we obtained an x-ray.  It was then that I saw that

14:41 1    it had correctly gone down the esophagus.  But it went down to

2    the esophagus, seemed to hit a certain point in his esophagus

3    and turned right back up.  So it didn't perforate the tip, just

4    turned right back up.  That was interesting to me because I

5    didn't know what would have blocked it from continuing any

6    further.

7         So we reinserted again.  The nurse inserted again.

8    Again, it went down smoothly and, again, got stuck at the same

9    point.  So I asked them that they stop because I had noticed,

10    again, it was the exact same length that it seemed to get

11    stuck.  We took him for another x-ray, and sure enough, it had

12    coiled again.

13         At that time, I was considering -- I was remembering

14    his history about a previous medical abdom- -- major.  He has a

15    scar for an abdominal surgery.  So sometimes with any type of

16    surgery, you could have scarring.  So I was wondering if there

17    was some sort of scarring or if there was any strictures that

18    had developed in his esophagus from so much starvation or if

19    there was a stenosis, a narrowing of the esophagus.

20         So then I became really concerned, because I thought,

21    if that's the case and we can't get through to the stomach,

22    what are we going to have to do to feed him?  So I asked that

23    the nurse use the other nostril, so we could be more to the

24    right side of the esophagus, in which it smoothly went down

25    without any problems.

14:42 1    So although I cannot -- it is just my medical opinion,

2  I would advise him to get an endoscopy whenever he can to make

3  sure that there's nothing that's causing some sort of

4  narrowing.  Because when we looked at this x-ray, when I

5  verified proper placement, something I had never seen before

6  was that his tube is actually, like, pressed against the wall

7  of the esophagus.  It's almost like it doesn't have room to

8  freely be in his esophagus.  Usually we see the tube just like

9  hanging in the esophagus.  But with him, it's directly across

10 the line of the right side of his esophagus, so I'm not sure

11 what is going on there.  But I believe that's the reason why we

12 had the coiling.

13 Q.  Now, you were asked about other complications, such as

14 perforations.  Did anything like that occur during Mr. Kumar's

15 placement?

16 A.  No.

17 Q.  How many times a day is Mr. Kumar receiving these nutrients

18 through the NG tube?

19 A.  We have advanced him to three times a day, breakfast,

20 lunch, and dinner.

21 Q.  And from what did you advance him?

22 A.  So there's always a risk, because of how many days he has

23 gone without eating, of something called refeeding syndrome.

24 The shakes we use, the meal replacements that we use have

25 carbohydrates.  That is what could potentially be dangerous in

14:44 1  refeeding syndrome.  So I never want to give too much

2  carbohydrates because I don't want the body to respond to that

3  in a negative way.  So I always start with two, usually for two

4  to three days, and then I advance to three.

5  Q.  And now that the tube is in place, what's the procedure for

6  feeding Mr. Kumar?

7  A.  So the end of the tube has -- it's a little -- like it's

8  closed, and we put a lock on it.  So whenever we want to feed

9  him, we hang the bag, we pour one shake into it, and then it

10  just drips into the tube and goes directly into his stomach.

11  Q.  Is there a medical alternative to the NG tube?

12  A.  A least invasive or just in general?

13  Q.  Well, is there a less invasive method than the NG tube?

14  A.  There's no less invasive.  I think the only other

15  alternative would be something much more invasive, which is

16  known as the PEG tube, and that's when you do an insertion.

17  It's a surgical procedure into the stomach to have a tube where

18  you would just pour the shake directly into the stomach.  But

19  that is much more invasive and carries more significant risks.

20  Q.  If the court orders were to be rescinded, what would you

21  expect would eventually happen to Mr. Kumar if he continues to

22  not eat?

23  A.  He would continue to deteriorate.

24  Q.  Is it your medical opinion that both of the orders should

25  remain in place?

14:45 1    A.  For this time being, yes.

2               MS. SAENZ:  May I have a moment, Your Honor?

3               THE COURT:  Yes.

4    Q.  Doctor, how common is the application of an NG tube?  How

5    common of a procedure is that?

6    A.  It is very common.

7    Q.  Now, you talked a little bit about sending Mr. Kumar to the

8    hospital.  What has been your experience with sending hunger

9    strikers to the hospital?  What happens once they get there?

10   A.  They always end up sending them right back.  If the

11   detainee allows them to do any type of monitoring, like blood

12   tests or imaging, then that will definitely get done.  But

13   usually they usually refuse everything, and they immediately

14   send the detainee right back.  They usually tend to call me and

15   ask to speak to the physician, I'm sure because they are

16   alarmed by what they are seeing.  And they always state that

17   they cannot do anything with someone on hunger strike.  So they

18   send them right back to me.  They will usually give me their

19   opinion on what they were hoping to obtain or what tests they

20   did do, and then they will send me whatever results they have.

21   But they are always returned back to our facility.

22              MS. SAENZ:  Pass the witness, Your Honor.

23              THE COURT:  Mr. Benoit.

24

25

1                    REDIRECT EXAMINATION

2    BY MR. BENOIT:

3    Q.  Doctor, how common are involuntary placements of

4    nasogastric tubes to force-feed somebody?

5    A.  I would say very uncommon.

6    Q.  It is very uncommon, right?  And you mentioned earlier that

7    if Mr. Kumar -- well, you had some concerns and some issues

8    with the application of his nasogastric tube, right?

9    A.  Yes.

10   Q.  And those issues, if he continues on his hunger strike, are

11   issues that you are going to have to continue to deal with,

12   right?

13   A.  If we needed to reinsert the tube or what do you mean?

14   Q.  I have heard you testify that you, in fact, have to

15   reinsert the tube every so often just for purposes of

16   infection; isn't that right?

17   A.  The tube can remain in place every 30 days.

18   Q.  So every month you will have to replace it, right?

19   A.  Yes.

20   Q.  Have you sent -- and you said that you -- an endoscopy

21   would help you understand why there were concerns with the

22   nasogastric placement, right?

23   A.  It would be my medical recommendation to a patient that he

24   undergo an endoscopy to see if there is anything that might

25   have led to him coiling.

14:48 1    Q.   You have made no request for a transfer for Mr. Kumar to go

2    to a facility where he can have that endoscopy take place,

3    right?

4    A.   No.

5    Q.   That is something that you can do, right?

6    A.   I can have it done, yes.

7    Q.   Now, we talked a lot about alternatives to a hunger strike.

8    And if this court order were rescinded or were denied, you and

9    your agency would have to consider alternatives, right, to the

10   nasogastric placement?

11   A.   Yes.

12   Q.   First, I heard you mention that one would be that he can

13   stay on Boost, but consider himself still on hunger strike,

14   right?

15   A.   Yes.

16   Q.   That kind of defeats the purpose of a hunger strike,

17   doesn't it?

18   A.   I don't believe so.

19   Q.   On Friday, I heard you testify that it does defeat the

20   purpose of a hunger strike; isn't that true?

21   A.   No, I don't recall saying that.  I believe for them, for

22   their sake, they would like to remain known as being on a

23   hunger strike because of the reason why they are doing it.

24   Q.   The reason that you say that they can remain on a hunger

25   strike is simply because that fits the protocol within the

14:49 1    guidelines that they are officially hunger strikers, right?

2    A.  Because they get to be addressed as being on a hunger

3    strike, yes.

4    Q.  It's because they fall under the hunger strike protocol,

5    correct?

6    A.  Yes.

7    Q.  But if somebody is on a hunger strike, doesn't taking

8    nutrition kind of defeat the purpose of it?

9    A.  I don't believe it defeats their purpose.  I think that

10   they -- from what I have been told by Mr. Kumar and other

11   hunger strikers, they are on a hunger strike, not because they

12   are truly trying to starve themselves, but because they are

13   hopeful that it might change the course of their deportation

14   status.

15   Q.  Well, and, hopefully, we will have an opportunity to hear

16   from him.  You mentioned that you have seen a change in

17   Mr. Kumar's mental state.  It's something that you described as

18   depression, right?

19   A.  Yes.

20   Q.  But, again, you are not making a clinical diagnosis that

21   Mr. Kumar is depressed, correct?

22   A.  Yes, I am able to do so, and I am making a clinical

23   diagnosis that he is clinically depressed.

24   Q.  Your medical health professionals who have done mental

25   health evaluations on him have not made that diagnosis?

14:50 1    A.  There has been no other physician who has done that type of

2    evaluation.  The other person you referred to earlier is a

3    social worker.

4    Q.  You stated earlier that you are not a mental health expert.

5    Is that clear?

6    A.  But as a family medicine physician, I am able to make that

7    diagnosis.  And I, in fact, treat many cases of depression,

8    both in the facility and in the private clinic.

9    Q.  And in a private clinic, if you saw somebody with

10   depression, you would refer them to a mental health expert,

11   right?

12   A.  No.  They would be under my care.  I would refer them to

13   cognitive therapy, and if needed, I would provide medical

14   therapy.

15   Q.  But for mental health therapy, that's not something that

16   you would do?

17   A.  A psychologist would provide cognitive therapy, so I would

18   recommend that they find a therapist.

19   Q.  Have you provided any sort of psychological or psychiatric

20   recommendation or referral for Mr. Kumar?

21        THE COURT:  Mr. Benoit, you have addressed that

22   completely.  Move along.

23        MR. BENOIT:  Understood, Your Honor.

24   Q.  I understand, Doctor, that, knowing Mr. Kumar's health, you

25   said that you believe that his health would improve if he

14:51 1  started eating, correct?

2  A.  Yes.

3  Q.  And he has told you that he would eat if he was given his

4  freedom, correct?

5  A.  Yes.

6  Q.  If I understand your testimony correctly -- I just want to

7  make sure I understand -- you won't send him to a medical

8  facility outside of the detention center because doctors -- you

9  understand that doctors in a private medical center will not

10  ethically conduct an involuntary force-feeding; is that right?

11  A.  That is not correct.  I will most definitely send him to a

12  hospital if I feel that something acute is going on.  But if I

13  would send him so that somebody could feed him, I will not.

14  Q.  And you have come to the Court because you thought that

15  there was an acute life-threatening condition with Mr. Kumar,

16  right?

17  A.  That can be fixed with feeding, yes.

18  Q.  Would you welcome a second opinion from an independent

19  medical physician regarding the need to force-feed Mr. Kumar?

20  A.  Absolutely.

21       MR. BENOIT:  Pass the witness, Your Honor.

22       MS. SAENZ:  Nothing further, Your Honor.

23       THE COURT:  Doctor, what was his BMI at the time you

24  came for the order of force-feeding him?

25       THE WITNESS:  It was a 16.

14:53 1          THE COURT:  And what is a healthy BMI?

2          THE WITNESS:  He would -- it would be recommended that

3     he be above a 19.

4          THE COURT:  Fair enough.  So to summarize, there is no

5     alternative to the nasogastric tube for someone that does not

6     want to ingest voluntarily; is that correct?

7          THE WITNESS:  Correct.

8          THE COURT:  The other alternative is a direct feed

9     into the stomach, I take it?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  But there is nothing below, so to speak,

12     the nasogastric tube; is that correct?

13          THE WITNESS:  Correct.

14          THE COURT:  So is there something else?

15          THE WITNESS:  I have strongly recommended -- because I

16     have done this in the past with other hunger strikers -- if he

17     would agree to drink the Boost orally, he would remain on a

18     hunger strike.  And he could have the tube removed, and he

19     could just drink it three times a day and still remain on a

20     hunger strike.

21          THE COURT:  So what I want to understand is that

22     Mr. Benoit suggested that you would welcome another opinion --

23          THE WITNESS:  Yes.

24          THE COURT:  -- about alternatives to the nasogastric

25     tube.  And I want to make sure I understood that, in essence,

14:54 1    there are two alternatives.  For someone that refuses to

2    voluntarily ingest food, and by "food" I'm saying regular food,

3    or the --

4             THE WITNESS:  The Boost.

5             THE COURT:  -- the Boost.  For someone that refuses to

6    do that, there are only two alternatives:  The nasogastric tube

7    or -- I didn't quite get -- what was the name of the other one?

8             THE WITNESS:  It is called a PEG tube.

9             THE COURT:  Okay.  Spell that for me, please.

10            THE WITNESS:  It is P-E-G, PEG tube.

11            THE COURT:  Parenteral gastric?

12            THE WITNESS:  Uh-huh.

13            THE COURT:  Oh, okay, got it.

14            So I understood you, then, to say that there's just

15    two alternatives then?

16            THE WITNESS:  Yes.

17            THE COURT:  So there is no other way to accomplish a

18    nasogastric tube, other than what you described?

19            THE WITNESS:  Yes.

20            THE COURT:  Fair enough, thank you.

21            Anything else?

22            MS. SAENZ:  Nothing, Your Honor.

23            MR. BENOIT:  Not for this witness.

24            THE COURT:  Can the witness be excused?

25            MR. BENOIT:  Yes, Your Honor.

14:55 1          MS. SAENZ:  Yes, Your Honor.

2          THE COURT:  Ma'am, thank you for your time.  You are

3    excused.

4                          *  *  *  *  *  *

1                        **I N D E X**

2
                      <u>Direct</u> <u>Cross</u> <u>Redirect</u>
3    WITNESSES FOR THE
     RESPONDENT:
4    DOCTOR               2      31    48

5

6

7

8

9

10

11

12

13

14

15

16

17              C E R T I F I C A T E

18      I certify that the foregoing is a correct transcript from

19   the record of proceedings in the above-entitled matter.  I

20   further certify that the transcript fees and format comply with

21   those prescribed by the Court and the Judicial Conference of

22   the United States.

23
     Signature: /s/Nalene Benavides      Date:  August 23, 2019
24            Nalene Benavides, RMR, CRR

25