

# Keck Human Rights Clinic

In the Matter regarding Detention of Ajay Kumar, ICE Detainee at El Paso Service Processing Center
DOB: 10/13/1985

Reviewer Name: Parveen Parmar, MD MPH

*Qualifications:*

1. I am an American physician licensed to practice in the State of California, practicing in the Los Angeles County + University of Southern California (LAC+USC) Emergency Department. I have been board certified to practice emergency medicine for 10 years, all 10 of which I have worked at a Level 1 trauma center, taking care of critical patients. I am an Associate Professor of Clinical Emergency Medicine at the University of Southern California, and Chief of the Division of Global Emergency Medicine at the Keck School of Medicine, University of Southern California. I teach emergency medicine, teaching both medical students and residents. I regularly care for detained patients in the LAC+USC Jail Emergency Department and thus am familiar with standards of care for the provision of health care in detention. I also routinely work with a large proportion of patients with emergency health needs and critical illness at the LAC+USC Jail emergency department and in the main emergency department. I have also reviewed multiple records of health care delivered specifically in U.S. Immigration and Customs Enforcement (ICE) detention and am familiar with standards of care in this setting – including the ICE Performance-Based National Detention Standards 2011 (as revised in 2016).
2. Prior to my time at LAC+USC, I worked at Brigham and Women's Hospital, a Harvard-affiliated hospital, as an emergency physician for 8 years. I taught emergency medicine to medical students at Harvard Medical School, and residents in the Harvard Affiliated Emergency Medicine Residency Program. I currently served as the Director of the International Emergency Medicine Fellowship Program at Brigham and Women's Hospital. Additionally, I was an Assistant Professor at Harvard Medical School and the Harvard School of Public Health prior to my appointment at the University of Southern California, where I taught coursework specific to health of refugees and asylum seekers, global health, and humanitarian aid.
3. From 2008 to 2019, I served as faculty at the Harvard Humanitarian Initiative –a university-wide center involving multiple entities within the Harvard community that provide expertise in public health, medicine, social science, management, and other disciplines to promote evidence-based approaches to humanitarian assistance. I am a public health researcher and hold a Master of Public Health from the Harvard School of Public Health from the department of Global Health and Population. My research focuses on the epidemiologic study of sexual violence in conflict, health and refugee populations. I have conducted both qualitative and quantitative research in Cameroon, Burma, Japan, Bhutan, Bangladesh, Jordan, and India.
4. I also have a background in humanitarian aid and have served as national health coordinator for the International Rescue Committee in Pakistan after the 2010 flood and have conducted research on populations affected by the tsunami in Japan and drought in Ethiopia. I have worked clinically with underserved populations as a volunteer in El Salvador, Nicaragua, and Liberia.

University of Southern California

1000 South Fremont Avenue, Unit 22, Building A-6, Fourth Floor, Alhambra, CA 91803 • Tel: 626 457 5858 • Fax: 626 457 4090

5. I am a graduate of the Northwestern Feinberg School of Medicine, and where I was elected to the Alpha Omega Alpha Medical Honor Society. I completed an emergency medicine residency and was selected as chief resident at the UCLA Olive View Emergency Medicine Residency Program. This residency provided extensive experience in history taking and physical examinations in adults and children with critical and non-critical medical and psychiatric illness. I have evaluated and treated many medical and psychiatric conditions as a routine course of care. I am a graduate of the International Emergency Medicine Fellowship Program at Brigham and Women's Hospital.
6. In my routine practice as an emergency physician, I provide medical and psychological evaluations of my patients on a regular basis. I consider a full history, past medical and social histories, physical exam and behavioral evaluation to be a part of a routine, comprehensive examination.
7. I have received no remuneration for my time reviewing this case, I have done so as a volunteer.

## I. Findings from Chart Review

I have reviewed roughly 471 pages of records relevant to the care of Mr. Kumar, as well as the transcript of the ICE doctor's testimony from a hearing on August 19, 2019. The medical records I reviewed were ICE medical records documenting ICE care of Mr. Kumar from July 18 to August 15, 2019. I am familiar with ICE PBNDS 2016 and have reviewed these standards for the purposes of this review. I have also reviewed and will cite relevant medical literature with regards to the care of individuals on hunger strike.

I used my education, training, and experience and applying reliable principles and methodology of medical care, to review the documentation in this case to come to the following conclusions.

I am concerned that the care Mr. Kumar is receiving in ICE custody is *markedly below standard of care, and putting his life at risk.* My concerns are summarized below, with references to the medical record and ICE doctor transcript referenced when appropriate.

1) Force-feeding has been condemned as unethical by the World Medical Association, the American Medical Association, and multiple other professional organizations. The ICE physician asserts that this is a situational ban (pg 25 of the transcript, i.e., MD states this standard does not apply in detention), but in fact, this is *exactly where it applies*. It is unethical to force a patient with capacity to accept medical care they have refused, and physicians both inside and outside of detention are expected to adhere to this standard.[1]
2) According to ICE PBNDS 2016, patients with critical illness must be transferred to a hospital for a higher level of care. The El Paso Service Processing Facility is not capable of providing critical care, and the ICE physician is not board certified to provide critical care—and does not do so on a regular basis. There are facilities nearby that are capable of providing necessary care in close proximity to this ICE detention facility.
3) The ICE physician has sought two court orders to force Mr. Kumar to comply with medical care to which he did not consent. The claim of the ICE physician is that to do so is medically necessary to save this individual's life. However, this MD did not have a conversation on the risks/benefits/alternatives to forced hydration/feeding with Mr. Kumar in his language. Of note, the nurse practitioners who regularly see this patient always use a Punjabi interpreter, recognizing that discussions with regards to health exceed his level of English. The ICE physician notes on

---
[1] https://phr.org/our-work/resources/hunger-strikes-and-the-practice-of-force-feeding/

University of Southern California

1000 South Fremont Avenue, Unit 22, Building A-6, Fourth Floor, Alhambra, CA 91803 • Tel: 626 457 5858 • Fax: 626 457 4090

7/21/19, (pg 292-4 of the medical record), that Mr. Kumar "speaks some English and appears to understand what is said."  In contrast, on 7/25/19, (pg 242-4 of the record), the LCSW noted that the patient "understands English and can speak it minimally", and further noted that when the patient had a conversation with use of an interpreter, he agreed to IV hydration.  In short, this <u>*ICE physician is violating the patient's autonomy without having a conversation about this decision and his options in his own language.*</u>

4) The ICE physician asserts that IV hydration and force-feeding are critical to make this patient better, but this physician is <u>not administering adequate calories via NG tube, adequate hydration despite the ability to do so via court order, nor providing adequate medical care given this patient's level of illness.</u>  Thus, this order to force-feed this patient was made after weeks of substandard care by the ICE physician—which led directly to this patient's decline by 8/14, when the nasogastric (NG) tube was inserted.

When caring for hypotension, the goal is to provide enough IV fluid to keep the patient's blood pressure up, aiming typically for a systolic blood pressure around 100s (varies from patient to patient, Mr. Kumar's baseline blood pressure is roughly 120/80 based on early charting), or mean arterial pressure of 60.  This is done to assure adequate perfusion of critical organs, including brain, heart, intestine, kidneys, etc.  However, Mr. Kumar is allowed by the ICE physician to be persistently and critically hypotensive despite the order from the court for IV hydration, which could have fixed this.  *Persistent hypotension below 90/60 would lead Mr. Kumar to be admitted to an intensive care unit if he were in my emergency department*, and yet in every instance I've cited below, the patient is given no or inadequate IV hydration though it is clearly medically indicated.  What is particularly unfortunate is that he is noted, repeatedly, to have orthostatic hypotension, or blood pressure that drops when standing.  This type of low blood pressure is very specifically responsive to IV fluids.  Decisions to administer IV fluid appears to be being made in a way that is inconsistent with clinical practice in critical patients—that is, if Mr. Kumar drinks a certain amount of fluid, regardless of his vital signs, medical staff do not administer IV fluid even if he would improve with it.  The ICE physician appears to have been made aware of these vitals on multiple occasions throughout the chart but declines to act on them by ordering more IV fluid—which again, is a very basic standard of care.

Additionally, standard of care requires a physician to administer an IV bolus of fluid when a patient's blood pressure is low, and immediately recheck to see whether it has taken effect or if additional fluid is needed, within minutes of administration of this fluid.  *This was not done once in ICE detention.*  Vitals that are critical and near death are not rechecked by clinical staff on a recurrent basis.  When critically abnormal vital signs discussed with the ICE physician, no additional fluid boluses are ordered, not even an order to monitor the patient's vital signs closely. Patients with this level of low blood pressure are monitored on cardiac monitors with very frequent blood pressure checks, often <u>*every 10 minutes*</u> while critically low with continued boluses of IV fluid, typically, again, in an intensive care unit setting.  In this facility, vitals are ordered for <u>*every six hours*,</u> during which time critical, life threatening changes could happen.  Worse yet, on multiple days, the staff take vitals far less than even every 6 hours, even when the blood pressure is critically low.

The ICE physician is <u>rarely</u> present and does not personally evaluate this critically ill patient when he has profoundly abnormal vital signs.  In the transcript, the physician asserts that they "see the patient informally" on a regular basis, however this is never charted nor referred to by any of the nursing staff.  It is common for nurses to chart "MD at bedside" or some variant--this was never seen.  7/18, 7/21, 8/11, and 8/14 are the *only days* the ICE doctor does an in-person

University of Southern California

1000 South Fremont Avenue, Unit 22, Building A-6, Fourth Floor, Alhambra, CA 91803 • Tel: 626 457 5858 • Fax: 626 457 4090

evaluation of this critical patient. Further, it is well below standard of care to see a patient and not document your visit/an assessment.

This lack of appropriate attention to critically low blood pressure and astonishingly infrequent MD evaluations of a very ill patient, on whom treatments are being forced without their consent, would never be tolerated in any hospital and is, frankly, the worst medical care I have seen in my 10 years of practice.

Below I have summarized instances of severe, critical orthostatic hypotension that occurred despite the medical team having both the tools and capacity to adequately hydrate this patient:
   a. 7/26/19 standing blood pressure is **76/51** at 11:06am (pg 239-41), with supine blood pressures also very low in the low 90s systolic. Only one liter of IV fluid is given, and no reassessment to measure response to bolus.
   b. 7/27/19 (pg 217-19) blood pressure is **82/60**, HR 102 at 9:23 am. Mr Kumar given IV fluid, vitals were not rechecked until after 1pm.
   c. 7/28/19 (pg 203-13) blood pressure is 97/63 supine, but drops to **69/43** standing at 8am. An IV was placed at 9:30am, and he was given one liter of fluid at roughly 10am. His vitals were rechecked at 11am, and Mr. Kumar still has persistent orthostatic hypotension (90/52 supine-->93/63 sitting-->**78/47** standing). He is not given additional fluid which is what is indicated for orthostatic hypotension, and *Mr. Kumar's vitals are not assessed until the next day, despite being critically low.*
   d. 7/30/19, vitals are only done 3 times during the entire day (not 4, as is consistent with vitals taken on each shift). At 10:12 am, Mr. Kumar's blood pressure orthostatic blood pressure was 103/66 laying down-->99/65 sitting-->**87/58** standing. Orthostatic vitals were not repeated and his vitals were not taken until 1:33pm.
   e. On 7/31/19, Mr. Kumar's vital signs were *only checked once*. When checked at 8am, his blood pressure remained orthostatic: 101/63 supine->106/69 sitting->**87/58** standing. It is unclear if he was given IV fluid on this day, but does not appear so.
   f. On 8/1/19, Mr. Kumar's vitals were <u>*only taken once*</u>. These were critically low at **75/40** supine->**73/46** sitting->**72/49** standing. *These are life threatening vitals that require treatment and monitoring in an intensive care unit and every 10 minutes vitals to assess response to treatment*, but per the record no IV fluids are administered, and no action is taken.
   g. Again on 8/2/19, Mr. Kumar's blood pressure was only taken once, and remain low: 92/57 supine->**89/56** sitting->91/61 standing. He is not given IV fluid on this day.
   h. Of note, on 8/3/19, the first aggressive hydration is given, 3 liters of IV fluid. This was given immediately prior to transport to the Sierra Providence East Medical Center. There, he was given another 2 liters, suggestive of a profound fluid deficit.
   i. On 8/4/19, Mr. Kumar's blood pressure was 98/62 supine->**73/44** sitting-**>60/33** standing at 9:50am. These critical vitals were not acted on (no immediate administration of IV fluids), and were not rechecked until 11:19am; 101/61 supine->100/67 sitting->**67/42** standing. *Of note, Mr. Kumar was diagnosed with colitis during his evaluation, and worsening colitis might be a cause of sepsis, which causes low blood pressure, and is not always accompanied by fevers. This was not discussed with the patient, considered, and the patient was not transferred to a medical facility to evaluate this possibility. This is well below standard of care.*
   j. On 8/5/19 at 8:16 am, Mr. Kumar's orthostatic blood pressure was **89/57** supine**->85/58** sitting**->72/50** standing, these were not rechecked until 9 hours later after 5pm. Again, despite availability of the court order, no IV fluids were given.

University of Southern California

1000 South Fremont Avenue, Unit 22, Building A-6, Fourth Floor, Alhambra, CA 91803 • Tel: 626 457 5858 • Fax: 626 457 4090

k. On 8/6/19 at 11:35 am, Mr. Kumar's orthostatic blood pressure was 91/69 supine->94/58 sitting->**67/64** standing, no IV fluid was given, and these abnormal vitals were not rechecked until 10:18pm.
l. On 8/7/19 at 11:25 am, Mr. Kumar's orthostatic blood pressure was 93/59->97/68->**83/65**. A note is made by the ICE nurse practitioner that "the patient has been drinking greater than 2L of water" thus no IV fluids are needed, despite presence of 4+ ketones and orthostatic hypotension. This abnormal blood pressure is not rechecked until 9:40pm.
m. Worryingly, Mr. Kumar begins to show a slow heart rate, or bradycardia, on 8/7/19. His heart rate is 56. This is an early sign of damage to the heart caused by starvation. No action is taken to place this patient on cardiac monitoring to follow this closely.
n. On 8/8/19 at 7:58 AM, Mr. Kumar's orthostatic blood pressure was **79/44** supine->**72/55** sitting->**65/43** standing. This is discussed with the MD, who decides not to give IV fluids. These vitals were not rechecked until 8:19 pm. In fact on this day with severely critical results, Mr. Kumar's vitals were only taken *twice.*
o. On 8/9/19, Mr. Kumar's blood pressure was **80/46** supine ->**87/58** sitting->**61/43** standing. Again, no IV fluids given despite this very critical reading, and the blood pressure was not rechecked until 12:45pm, and it was still low at **85/55**.
p. On 8/10/19, Mr. Kumar's orthostatic blood pressure was **81/43** supine-->**62/36** sitting-->**56/43** standing. *A systolic blood pressure in the 50s/60s is a near death blood pressure.* These were not rechecked until 1:44pm and again, despite availability of court ordered treatment, IV fluid was not given as any clinician would in a similar circumstance. His heart rate is 57, again low and concerning in this context.
q. On 8/11/19, Mr. Kumar's orthostatic blood pressures are **70/50** supine-->**78/52** sitting-->**68/42** standing. Mr. Kumar is seen by the ICE physician, who opts to give him one liter of fluid and *does not recheck his response and need for additional fluid or treatment*. His critical vital signs are not checked again until 11:25pm. Instead of opting to treat his declining health with medical interventions that are within standard of care and within reach (additional IV fluids, sending Mr. Kumar to a hospital for administration of thiamine, checking electrolytes and cardiac monitoring of this critical patient, etc), *ICE physician instead opts to recommend force feeding.* Force feeding was sought in response to a patient who became much more critically ill in the context of abysmally poor care from the ICE medical facility.
r. On 8/12/19, Mr. Kumar's orthostatic blood pressures were **86/55** supine-->**77/55** sitting-->**66/45** standing at 8:29 am, and were not repeated until 6 hours later. He is still getting one liter of IV fluid only, no additional fluid was ordered.
s. On 8/13/19, again Mr. Kumar is only receiving one liter of fluid per day. He endorses severe abdominal pain (something he endorses consistently), and his blood pressures at 8:36am are **83/47** supine-->**64/38** sitting-->**55/42** standing. The MD was made aware and did not order additional fluids or repeat vitals more frequently, once again. Though vitals were documented at 4:20pm, 8 hours later, these are remarkably similar to the 8:30am vital signs—which suggests that perhaps these were not in fact actually measured. The ICE MD did not come to evaluate this patient, with critical vital signs.
t. On 8/14/19 the ICE physician evaluates the patient, who is found to have the following vital signs: *heart rate **115** standing, BP **91/57** supine, **74/53** sitting, **54/40** standing* at 7:27 am. This is the day the NG tube was placed. Only one liter of IV fluid was given, and 237cc of a Glucerna shake. These vitals were not checked until 5:07 pm, at which point the patient remained hypotensive at **85/56.**
u. On 8/15/19, Mr. Kumar's blood pressure remained low, **87/50** at 7:30am. He is given one Glucerna shake by NG tube and no IV fluid.

University of Southern California

1000 South Fremont Avenue, Unit 22, Building A-6, Fourth Floor, Alhambra, CA 91803 • Tel: 626 457 5858 • Fax: 626 457 4090

5) As noted above, a Punjabi or Hindi interpreter is not consistently used by the medical care staff—with the exception of the nurse practitioners. Specifically, when Mr. Kumar was seen at the Sierra Providence East Medical Center, he signed out against medical advice *but no Punjabi interpreter was used during this conversation*. While this oversight occurred outside of the ICE detention facility, it is the responsibility of the ICE medical staff to ensure Mr. Kumar fully understood his diagnoses, options for care, and potential consequences of declining care in his own language. This was never done.

6) Mr. Kumar's colitis may have resulted from multiple factors—but most likely this represents an ischemic colitis, potentially as a result of a blocked vein (superior mesenteric vein thrombosis was noted on his CT scan on 8/3/19). It might also have resulted from an infectious colitis, as at this point Mr. Kumar's immune system is very likely impaired. Untreated ischemic colitis can lead to death of the intestines, need for emergency surgery, or perforation of the bowel, sepsis, and death. According to the record, none of this was explained to Mr. Kumar with an interpreter. Options for treatment include IV antibiotics, admission to a hospital for close hydration, etc. He would require consultation with a gastroenterologist. None of this has been offered.

Furthermore, the persistent low blood pressure in the ICE facility, not appropriately treated by the medical staff as described in detail above, *would worsen ischemic colitis substantially*. On page 19 of the ICE physician transcript, the physician states as much:

"But, most importantly, is the fact that this physician correctly pointed out something might be going on with the superior mesenteric vein, which would cause his abdominal pain, which happens from hypovolemia, which also leads to colitis…."

Unfortunately, wholly inadequate care by this physician is responsible for worsening this colitis, and throughout the record after 8/3/19, Mr. Kumar continues to endorse continued, sometimes severe, abdominal pain. *He requires urgent admission to a hospital to manage this issue.*

7) Based on the record, this ICE physician does not fully understand the consequences of starvation for a prolonged period of time, nor manner in which to initiate refeeding, even if forced. During the transcript, the ICE physician states that their main concern is "ketosis", stating that the involuntary hydration and refeeding as made this ketosis go away. First, ketosis was noted on every UA seen on my review from 7/18-8/15, thus it never went away.

Additionally, the ICE physician has not shared some of the most critical and concerning effects of starvation, please refer to *Eischelberger, et al*[2] and *Gordon, et al*[3] for a complete overview. In *Eischelberger, et al*[2] a protocol for refeeding and monitoring of patients is provided, and **the authors recommend that all patients with either weight loss greater than 20% or a hunger strike of more than 28 days *be hospitalized*.** Thus, the evidence suggests that Mr. Kumar must be admitted to a hospital, and very likely to an intensive care unit. In such a unit, Mr. Kumar would receive alternative care that he is not receiving in ICE detention – including IV provision

---

[2] Eichelberger, M., Joray, M. L., Perrig, M., Bodmer, M., & Stanga, Z. (2014). Management of patients during hunger strike and refeeding phase. *Nutrition*, *30*(11-12), 1372-1378.

[3] Gordon, D., Drescher, M., & Shiber, S. (2018). Security Hunger-Strike Prisoners in the Emergency Department: Physiological and Laboratory Findings. *The Journal of emergency medicine*, *55*(2), 185-191.

University of Southern California

1000 South Fremont Avenue, Unit 22, Building A-6, Fourth Floor, Alhambra, CA 91803 • Tel: 626 457 5858 • Fax: 626 457 4090

of thiamine, adequate repletion of electrolytes and fluid, cardiac monitoring, etc. Also, of note, patients in these publications were far more likely to decide to break their hunger strike once hospitalized and out of the detention setting. For many reasons, admitting Mr. Kumar in a hospital will likely save his life.

This ICE physician is not familiar with the critical impacts of starvation or refeeding (the doctor makes a passive reference to refeeding syndrome, glossing over the fact that for this reason refeeding must be done in an inpatient setting due to the possibility of electrolyte abnormalities, fluid overload, etc). Additionally, the ICE physician makes no comment on the patient's relative bradycardia despite profound dehydration, again, a sign that he requires hospitalization.

Finally, the ICE physician is not providing nutrition or vitamin repletion in line with any standard of care. Please see the table from *Eischelberger, et al*[2] below as a reference for the level of care and monitoring required:

Table 4
Recommendations for management of RFS in at-risk adults [11,14]

General recommendations
- Be aware that patients on hunger strike for >10 d are at risk
- Provide adequate assessment, interdisciplinary care plans, and follow-up
- Appreciate that risks apply whether patients are fed by the oral, enteral, or parenteral route
- Carefully restore circulatory volume: monitor heart rate and fluid balance
- Energy intake should be instituted carefully and gradually increased over 1 to 10 d
- Empirical supplementation of electrolytes and vitamins should be started before feeding is initiated

| Days | Energy (by all routes; daily) | Electrolytes/Vitamins/Minerals | Fluids/Sodium | Monitoring |
|---|---|---|---|---|
| 1–3 | 10 kcal/kg* and slowly increase to 15 kcal/kg* | Daily prophylactic electrolyte supplementation (unless prefeeding serum levels are normal):<br>- Phosphate 0.5–0.8 mmol/kg<br>- Potassium 1.0–2.2 mmol/kg<br>- Magnesium 0.3–0.4 mmol/kg<br>Supplement micronutrients:<br>- 200–300 mg thiamine IV 30 min before first eating, and then 200–300 mg IV or orally daily<br>- Vitamins: 200% of RDI<br>- Minerals and trace elements: 100% of RDI (no iron supplementation in the first week) | Restrict daily fluids to 20–30 ml/kg (restrict to sufficient to maintain renal function, to replace deficits or losses, and to avoid weight gain / zero fluid balance)<br><br>Salt: restrict daily sodium intake <1 mmol/kg/d (if edema develops, restrict further) | Serum electrolytes (K, Mg, PO$_4$) an glucose:<br>- Day 1: 2x/d<br>- Day 2–3: 1x/d<br><br>Monitor daily:<br>- Body weight (fluid balance)<br>- Clinical examination[y]<br>- Biochemistry[z]<br>- Preferably ECG monitoring i severe cases |
| 4–6 | 15–20 kcal/kg* | Continue electrolyte supplementation to restore normal serum levels:<br>- If phosphate <0.6 mmol, give 30–50 mmol phosphate IV over 12 h<br>- If potassium <3.5 mmol, give >20–40 mmol KCl IV over 4–8 h | Fluids 25–30 mL/kg/d (maintain zero fluid balance) | Serum electrolytes: 1x/d |
| 7–10 | 20–30 kcal/kg* | - If magnesium <0.5 mmol, give 24 mmol MgSO4 IV over 12 h<br>Supplement micronutrients:<br>Vitamins: 200% of RDI<br>Minerals and trace elements: 100% of RDI (no iron)<br>Electrolytes, minerals, trace elements, and vitamins substitution as above.<br>Iron should be supplemented from day 7 onward. | Fluids 30 mL/kg/d | Monitor daily:<br>- Body weight (fluid balance)<br>- Clinical examination[y]<br>- Biochemistry[z]<br>Body weight: 2x/wk<br><br>Clinical examination[y]: 1x/d<br><br>Biochemistry from day 7 onward[z]: 1x/wk |

ECG, electrocardiogram; IV, intravenous; RDI, reference daily intake
* Nutrients: carbohydrates 50%–60%, fat 30%–40%, and protein 15%–20%.
[y] Edema, blood pressure, heart rate, and cardiovascular and respiratory systems.

University of Southern California

1000 South Fremont Avenue, Unit 22, Building A-6, Fourth Floor, Alhambra, CA 91803 • Tel: 626 457 5858 • Fax: 626 457 4090

ᶻ Phosphate, magnesium, potassium, sodium, calcium, glucose, urea, creatinine, (thiamine: optional on day 1).

> During day 1-3, *twice daily* blood tests are recommended. 10-15 kcal/kg is recommended, roughly 500 calories for Mr. Kumar. The ICE physician gave him *180kcal*, day 1 and 2 (8/14, 15). Extensive electrolyte, vitamin and mineral supplementation is required during this time, but the ICE MD did none of this. The ICE physician may assert that these nutrients and electrolytes are present in the Glucerna shake administered, but these are *nowhere near* the levels suggested above. In short, the ICE physician placed an NG tube to administer *substandard nutrition.*

8) It is concerning that the NG tube was placed twice and coiled, and no further evaluation of the reason for this was done, though an endoscopy is indicated. The NG tube was placed without use of anesthetic. Though NG tubes are often placed without anesthesia, given the need for possible restraint of the patient and the forced nature of this intervention, making the procedure as comfortable as possible is key to success. No offer of lidocaine gel or cetacaine spray, used to numb the mouth and throat, was made.

9) Several of the ICE physician's assertions in the transcript of testimony are incorrect. The ICE physician's assertion that there "might be scarring from a prior abdominal surgery" is not based in fact, and is an odd assertion. An abdominal surgery (Mr. Kumar's record states he had a prior appendectomy) would go nowhere near the esophagus and would not result in scarring—this is a very odd assertion. The ICE physician's assertion that the blood urea nitrogen increases after IV fluids (pg 22) is also incorrect—in fact it is widely known that it *decreases* after IV fluid administration, again, rather basic knowledge that this MD does not know.

    This doctor's lack of knowledge about basic medical facts, this overwhelming evidence of substandard care delivered for weeks, and this doctor's willingness to rush to the unethical practice of force-feeding when other measures have not been tried is concerning. This doctor did not provide adequate IV hydration and has never responded to critical vitals appropriately. This MD never had a conversation with the patient to explore alternatives with the aid of an interpreter. Based on my review of this record, this MD has shown he/she is not capable of caring for a patient of this type.

10) The assertion was made in the transcript that because this patient has refused care at a hospital in the past he should not be transferred again. In fact, each time a transfer is indicated, he should be transferred and informed, in his language, of what treatment options are—and allowed to accept or refuse elements of care after an informed discussion. From the record, it does not appear that he has been given that option since August 3, 2019.

    Under the ICE PBNDS, it is true that the ICE physician must transfer a patient that is in a life-threatening situation to a more appropriate medical facility. As this affidavit lays out, a hospital setting would provide alternatives of care that are far more likely to save his life than the care he is currently receiving in the ICE detention center or than can be provided by nasogastric feeding. The ICE physician has not even discussed such care options with Mr. Kumar.

11) Finally, this patient states that he will only begin eating when released. As a clinician, I strongly urge that security concerns be balanced with the very real threat to this man's life. He presents to the US asserting his right to claim asylum, a right enshrined in international law by the Refugee Convention of 1951 and the 1967 protocol—a law which also protects him from punishment for

University of Southern California

1000 South Fremont Avenue, Unit 22, Building A-6, Fourth Floor, Alhambra, CA 91803 • Tel: 626 457 5858 • Fax: 626 457 4090

the act of illegal entry.[4] While many detainees present a real threat to the community as a result of previous violent acts, this man has no criminal record and has never committed a violent act. I strongly urge that unless there is a compelling reason to keep him in custody, he be released. As is clear from my review of his medical record, his health is at risk in ICE custody not solely from his hunger strike, *but from the truly substandard medical care he is receiving in detention.*

**II. Conclusion**

In summary, Mr. Kumar is receiving truly substandard care in custody and merits either immediate transfer to an acute care facility or immediate release. There is, based on my review, a compelling medical reason to explore safe alternatives to detention for Mr. Kumar, combined with access to ongoing medical care.

I declare under penalty of perjury, pursuant to the laws of the United States, that the foregoing is true and correct and that this affidavit was executed on 8/26/19 in Los Angeles, CA.

Parveen Parmar, MD MPH

---

[4] https://www.unhcr.org/en-us/1951-refugee-convention.html

University of Southern California

1000 South Fremont Avenue, Unit 22, Building A-6, Fourth Floor, Alhambra, CA 91803 • Tel: 626 457 5858 • Fax: 626 457 4090