# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

IN RE:                  §
                               §              **EP-19-MC-00205-FM**

AJAY KUMAR         §

## MEMORANDUM OPINION AND ORDER ON SUPPLEMENTAL EMERGENCY MOTION FOR AUTHORIZATION FOR NON-CONSENSUAL FEEDING

Before the court is "Supplemental Emergency Motion for Order of Authorization" ("Motion") [ECF No. 12], filed August 14, 2019 by the United States of America ("Government");[1] "Respondent's Response to the Government's Supplemental Motion for Order of Authorization and Request to Stay Court's Order" [ECF No. 18], filed August 19, 2019 by Ajay Kumar ("Respondent");[2] "Reply in Support of the United States' Supplemental Emergency Motion for Order of Authorization and Response in Opposition to Request to Stay Court's Order" [ECF No. 21], filed August 22, 2019;[3] "Respondent's Supplemental Brief in Opposition to the Government's Supplemental Emergency Motion for Order of Authorization" [ECF No. 25], filed August 27, 2019;[4] and "Sur-Reply in Support of the United States' Supplemental Emergency Motion for Order of Authorization" [ECF No. 28], filed September 3, 2019.[5]

---

[1] "Supplemental Emergency Motion for Order of Authorization" ("Mot."), ECF No. 12-2, filed Aug. 14, 2019 (redacted).

[2] "Respondent's Response to the Government's Supplemental Motion for Order of Authorization and Request to Stay Court's Order" ("Resp."), ECF No. 18, filed Aug. 19, 2019.

[3] "Reply in Support of the United States' Supplemental Emergency Motion for Order of Authorization and Response in Opposition to Request to Stay Court's Order" ("Reply"), ECF No. 21, filed Aug. 22, 2019.

[4] "Respondent's Supplemental Brief in Opposition to the Government's Supplemental Emergency Motion for Order of Authorization" ("Suppl. Resp."), ECF No. 25, filed Aug. 27, 2019.

[5] "Sur-Reply in Support of the United States' Supplemental Emergency Motion for Order of Authorization" ("Sur-Reply"), ECF No. 28, filed Sept. 3, 2019.

In the Motion, the Government seeks authorization to provide non-consensual medical examination, non-consensual hydration in the form of IV fluids, and nasogastric tube placement with necessary enteral feedings.[6]

## I.   BACKGROUND

### A.   Factual Background

Respondent is a citizen of India.[7]  Respondent entered the United States near Otay Mesa, California.[8]  On March 27, 2019, an immigration judge ordered Respondent removed to India.[9] Respondent filed an appeal with the Board of Immigration Appeals ("BIA") on April 29, 2019.[10] His appeal is still pending.[11]

Respondent is currently detained in a detention facility operated by Immigration and Customs Enforcement ("ICE") and is engaged in a hunger strike.[12]  Respondent stated his refusal to eat and hydrate is "because I want my freedom."[13]  Respondent's first documented missed meal was breakfast on July 9, 2019.[14]  ICE placed Respondent on hunger strike protocol after his ninth missed meal on July 11, 2019.[15]

---

[6] Mot. 1.

[7] *Id.* at 2 ¶ 1.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] "Emergency Motion Hearing" ("Hr'g Test.") 60 ¶ 23, ECF No. 31, filed Sept. 11, 2019.

[13] *Id.* at 61 ¶ 25.

[14] Mot. 2 ¶ 2.

[15] *Id.* at 3 ¶ 2.  Under 2011 Operations Manual ICE Performance-Based National Detention Standards, an individual is placed on hunger strike protocol 72 hours after the first missed meal.  Immigrations and Customs Enforcement, Operations Manual ICE Performance-Based National Detention Standards (rev. July 2016)

On July 24, 2019, the Government filed an ex parte motion to obtain authorization for the United States Department of Homeland Security and ICE to perform non-consensual medical examination and non-consensual hydration in the form of IV fluids to Respondent after he missed 46 meals. [16]  In a declaration submitted to the court, a doctor under contract with ICE ("ICE Doctor") noted medical intervention was necessary to combat serious medical complications arising from the hunger strike and dehydration.[17]

On July 24, 2019, the court granted the ex parte motion and issued an order authorizing medical providers under contract with ICE to perform non-consensual medical examination and non-consensual hydration in the form of IV fluids.[18]

ICE transported Respondent to a local hospital on August 3, 2019 because of "severe right flank pain."[19]  The chief concern was Respondent may have a "kidney stone" or "possibly an ulcer in the stomach from not eating."[20]  At the hospital, Respondent accepted IV fluids and a CT scan.[21]  The hospital diagnosed Respondent with colitis—a colon infection.[22]  With the

---

("PBNDS"), § 4.2(II)(1), https://www.ice.gov/detention-standards/2011 ("Any detainee who does not eat for 72 hours shall be referred to the medical department for evaluation and possible treatment by medical and mental health personnel.").

[16] "Order of Authorization Filed Under Seal" ("Order of Auth.") 1, ECF No. 4-2, filed July 24, 2019 (redacted).

[17] Id.

[18] Id. at 3.

[19] Hr'g Test. 19 ¶ 10–11.

[20] Id. at 20 ¶ 1–4.

[21] Id. at 20 ¶ 13–17.

[22] Id. at 20 ¶ 23.

3

exception of referring Respondent for "flank pain," ICE Doctor did not send him to an outside doctor to evaluate his condition.[23]

On August 5, 2019, the American Civil Liberties Union of Texas filed a motion on Respondent's behalf for the appointment of counsel.[24]  The court held the appointment of counsel was in the interest of justice, reasoning that Respondent had "not had the opportunity to meaningfully respond as to whether non-consensual medical examination and non-consensual hydration are necessary and appropriate."[25]

On August 14, 2019, the Government filed the Motion seeking further authorization to perform non-consensual medical examination in addition to non-consensual hydration in the form of IV fluids, and nasogastric tube placement with necessary enteral feedings.[26]  Prior to seeking force feeding authorization, ICE Doctor attempted to persuade Respondent to get nutrition from protein shakes.[27]  Respondent declined.[28]  The court granted the Motion[29] and set a hearing to determine whether the authorization should remain in place.[30]

At this hearing, ICE Doctor testified that the nasogastric tube insertion procedure was performed three times.[31]  On the first two attempts, the nasogastric tube "coiled"—resulting in

---

[23] Id. 33 ¶ 14–18.

[24] See generally "Motion for Appointment of Counsel," ECF No. 9, filed Aug. 5, 2019.

[25] "Memorandum Opinion and Order Appointing Counsel" 17, ECF No. 11, filed Aug. 13, 2019.

[26] Mot. 1.

[27] Hr'g Test. 44 ¶ 9–15.

[28] Id. at 36 ¶ 4–5.

[29] "Supplemental Order of Authorization" ("Order of Suppl. Auth.") 3, ECF No. 13-1, entered Aug. 14, 2019.

[30] "Order Setting Status Conference" 1, ECF No. 15, entered Aug. 14, 2019.

[31] Hr'g Test. 10 ¶ 9–12.

the tube failing to enter the stomach.[32]  This caused Respondent's nose to swell, and ICE Doctor to become concerned about whether the procedure could be successfully completed.[33] Respondent testified his nose began bleeding and he "was finding it difficult to breathe."[34]  ICE successfully inserted the tube on the third attempt and Respondent began receiving nutrition from it.[35]

As of September 9, 2019, Respondent's hunger strike has lasted 61 days, and he has missed 188 meals.[36]  ICE removed the nasogastric tube on September 5, 2019 as Respondent's health was improving.[37]  However, ICE Doctor reiterates that Respondent still refuses to eat, which raises the potential for "further deterioration and serious medical complications."[38] Therefore, the Government still requests the authorization to force feed remain in place.[39]

     *B.*     *Parties' Arguments*

        1.  The Government's Arguments

The Government contends the authorization of non-consensual medical treatment and nasogastric tube placement with necessary enteral feedings ("force feeding") is necessary to ensure Respondent's condition resulting from hunger strike "does not decompensate to a critical

---

[32] *Id.* at 48 ¶ 1–11.

[33] *Id.* at 48–49 ¶¶ 25, 1–5.

[34] *Id.* at 62 ¶ 23.

[35] *Id.* at 10 ¶ 15–16.

[36] "Advisory to the Court of September 9, 2019" ("Sept. 9 Adv."), ECF No. 30, filed Sept. 9, 2019, "Declaration" ("Sept. 9 Decl.") 1, Ex. A.

[37] *Id.* at 1–2 ¶¶ 5–7.

[38] *Id.* at 2 ¶ 9.

[39] Sept. 9 Adv. 2.

juncture."[40]  The Government argues the force feeding of immigration detainees is permissible, as courts have regularly found prison officials "may compel a prisoner to accept treatment when, in the exercise of professional judgment, they deem it necessary to carry out valid medical and penological objectives."[41]

The Government argues the appropriate standard to decide whether ICE has authority to perform force feedings is contained in *Turner v. Safley*.[42]  In defense of *Turner*, the Government cites to some district courts that used the *Turner* test in determining whether immigration detainees could be force fed.[43]

Finally, the Government, argues "detainee officials have broad administrative and discretionary authority over the institutions they manage" and points to potential security concerns related to hunger strikes.[44]

2.  Respondent's Arguments

Respondent contends he has a constitutional right to engage in a hunger strike under the First Amendment and a substantive due process right to refuse medical treatment.[45]  Respondent argues the court should apply the standard in *Youngberg v. Romeo*,[46] which the Supreme Court used to evaluate the due process rights of a mentally disabled individual involuntarily committed

---

[40] Mot. 8.

[41] *Id.* at 6 (citing *Pabon v. Wright*, 459 F.3d 241, 252 (2d Cir. 2006)).

[42] *Id.* at 8 (citing 482 U.S. 78 (1987)).

[43] Reply 9.

[44] Mot. 9 (citing *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)).

[45] Resp. 2.

[46] 457 U.S. 307 (1982).

to a state institution.[47]  Respondent notes he is a civil detainee awaiting his BIA appeal—not a

criminal prisoner.[48]  Therefore, Respondent reasons the *Turner* test does not apply to his

circumstances, as it is specifically aimed towards penological regulations.[49]  Respondent also

asserts ICE Doctor's medical testimony does not deserve deference under *Youngberg*, as it

substantially departs from accepted medical professional standard in recommending force

feeding.[50]

In the alternative, Respondent asserts that even if the *Turner* test were to apply to

immigration detainees, the request for authorization for force feeding lacks a basis.[51]

Respondent argues there are alternatives to force feedings: (1) transferring him to a community

hospital; or (2) releasing him on bond pending the completion of his immigration proceedings.[52]

In support of an alternative medical option, Respondent attaches an affidavit from Dr. Parveen

Parmar ("Dr. Parmar"), an Associate Professor of Clinical Emergency Medicine at the University

of Southern California, Keck School of Medicine.[53]  Dr. Parmar reviewed Respondent's records

and determined "the care Mr. Kumar is receiving in ICE custody is markedly below standard of

---

[47] Resp. 3, 5. (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982)).

[48] *Id.* at 1.

[49] *Id.* at 3–4.

[50] *Id.* at 8 (citing to World Medical Association, Declaration of Malta on Hunger Strikers, Guidelines for the Management of Hunger Strikes ¶ 13 (Nov. 1991) (revised Oct. 2006), available at https://www.wma.net!policies-post/wma-declaration-of-malta-on-hungerstrikers; World Medical Association, WMA Declaration of Tokyo Guidelines for Physicians Concerning Torture and other Cruel, Inhuman or Degrading Treatment or Punishment in Relation to Detention and Imprisonment (Oct. 1975) (revised Oct. 2006), available at https://www.wma.netlpoliciespostlwma-declaration-of-tokyo-guidelines-for-physicians-concerning-torture-and-other-cruelinhuman-or-degrading-treatment-or-punishment-in-relation-to-detention-and-imprisonment).

[51] *Id.* at 11.

[52] *Id.* at 12.

[53] Supp. Brief, "In the Matter Regarding Detention of Ajay Kumar, ICE Detainee at El Paso Service Processing Center" ("Parmar Aff.") 1, ECF No. 25-1, filed Aug. 27, 2019.

care, and putting his life at risk."[54]  Finally, Respondent claims the Government's security

interests are not credible, lack a foundation, and are insubstantial.[55]

## II.    DISCUSSION

### A.    Applicable Standard

The parties first contest which standard is proper to evaluate the Motion: *Youngberg* or

*Turner*.

*Youngberg* involved the question of whether a mentally disabled individual involuntarily

committed to a state institution had substantive rights under the Due Process clause of the

Fourteenth Amendment to (1) safe conditions of confinement; (2) freedom from bodily

restraints; and (3) training or "habilitation."[56]  The Supreme Court acknowledged that although

Romeo retained liberty interests protected by the Constitution, these rights were not without

limitations by the state's interests.[57]  The Court explained that "[i]n determining whether a

substantive right protected by the Due Process Clause has been violated, it is necessary to

balance 'the liberty of the individual' and the 'demands of an organized society.'"[58]

In *Turner*, the Supreme Court analyzed a prison regulation's reasonableness.  To reach a

determination, the Court employed a four-factor test: (1) there must be a valid, rational

connection between the prison regulation and the legitimate governmental interest put forward to

justify it; (2) whether alternative means of exercising the asserted constitutional right remain

---

[54] *Id.* at 1–2 (emphasis removed).

[55] Resp. 9.

[56] *Youngberg v. Romeo*, 457 U.S. 307, 309 (1982).

[57] *Id.* at 319–20.

[58] *Id.*

open to the detainee; (3) the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of resources; and (4) whether the presence of ready alternatives undermines the reasonableness of the regulations, or if the regulation is an "exaggerated response" to penal concerns.[59]

Some District Courts have applied the *Turner* factors when considering civil immigration detainee related hunger strikes.[60] This is incorrect. The *Turner* test is designed to address the legitimacy of "penological interests."[61] Courts have applied *Turner* specifically to a variety of prison regulation challenges.[62] This is highly illustrative of the penological focus enshrouding the test. The *Turner* factors themselves are explicit in referencing "prison staff,"[63] prison resources,"[64] and "inmates."[65] *Turner* also discusses the complexities of "running a prison."[66] Promulgating penological regulations affords the state more discretion.[67]

---

[59] *Turner v. Safley*, 482 U.S. 78, 89-91 (1987).

[60] *See United States v. Glushchenko*, No. 19-04678-PHX-SPL-JFM, 2019 WL 3290334, at *2 (D. Ariz. July 22, 2019); *see also Dep't of Homeland Sec. v. Ayvazian*, No. 15-23213-CIV, 2015 WL 5315206, at *4 (S.D. Fla. Sept. 11, 2015).

[61] *Turner*, 482 U.S. at 89.

[62] *See e.g. Beard v. Banks*, 548 U.S. 521, 525 (2006) (upholding a Pennsylvanian prison policy denying magazines, newspapers, and photographs to dangerous inmates); *Johnson v. California*, 543 U.S. 499, 510 (2005) ("the Court has applied the *Turner* test only to rights that are 'inconsistent with proper incarceration.' This is because certain privileges and rights *must necessarily be limited in the prison context*.") (emphasis added) (internal citations omitted); *Overton v. Bazzetta*, 539 U.S. 126, 131–32 (2003) (upholding prisons regulations restricting visitation rights); *Washington v. Harper*, 494 U.S. 210, 236 (1990) (holding the Due Process Clause permits involuntary treatment of a prisoner suffering from a mental disorder who is violent); *Prison Legal News v. Livingston*, 683 F.3d 201, 218 (5th Cir. 2012) (permitting prison regulations restricting access from certain books).

[63] *Turner*, 482 U.S. at 90.

[64] *Id.*

[65] *Id.*

[66] *Id.* at 85.

[67] *Overton v. Bazzetta*, 539 U.S. at 131 ("Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner."); *see also Turner* 482 U.S. at 89.

Words matter—a detainee is not a prisoner. These words have different definitions. This difference is not merely semantic nor are the words interchangeable. An individual seeking asylum is not akin to a criminal prisoner.[68] Respondent is a competent civil detainee.[69] Thus, the penological interests presented in *Turner* are inapposite to the merits of this action. Accordingly, evaluating the claim under *Turner* would be unnecessarily restrictive on Respondent's Constitutional rights.

The correct standard to apply to a civil immigration detainee is *Youngberg*—where the Supreme Court evaluated a claim of an individual involuntarily committed by balancing the state's interests and the individual's liberty interests.[70] In *Youngberg*, the Supreme Court stated: "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."[71]

It is undisputed the conditions of Respondent's confinement are not designed to punish.[72] As Respondent is civilly confined, his detention certainly warrants more considerate treatment than a criminal prisoner. Stricter treatment is reasonably necessary in prisons due to the many fears uniquely present in a prison environment. These concerns can include escape,[73] violence,[74]

---

[68] "Mr. Kumar is in the lawful custody of ICE pursuant to 8 U.S.C. § 1226 . . . he is not being held pursuant to a sentence of incarceration for the commission of a crime." Mot. 8.

[69] Hr'g Test. 14 ¶ 15; Mot. 8.

[70] *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982).

[71] *Id.* at 321–22.

[72] *See generally* Mot.; Sur-Reply

[73] *Turner v. Safley*, 482 U.S. 78, 91 (1987).

[74] *Id.*; *see also Pell v. Procunier*, 417 U.S. 817, 826-27 (1974).

10

or encouragement of further criminal behavior.[75]  The Government does not allege he may escape—as was a concern in *Turner*[76]—nor does ICE allege he is violent or dangerous.[77]  The Government meekly states that hunger strikes present a concern for "security problems" yet fails to offer any support for this proposition.[78]  Contrary to the Government's fear of disruption, ICE Doctor testified Respondent was "cooperative and respectful" despite his protest.[79]

Furthermore, Respondent is not charged with a crime, and if his appeal is denied the outcome is simply deportation—not incarceration.[80]  This distinguishes his confinement from even pre-trial detention, where there is a possibility of incarceration.  Accordingly, this court finds it is proper to evaluate Respondent's claim under the *Youngberg* balancing test.

> B.    *Applying Youngberg, the State has an Overwhelming Interest in Preventing Hunger Strike Related Deaths*

The state must provide "adequate food, shelter, clothing, and medical care."[81]  The 2011 Operations Manual ICE Performance-Based National Detention Standards ("PBNDS") inform detainees that they will receive "appropriate and necessary medical, dental and mental health

---

[75] *Overton v. Bazzetta*, 539 U.S. 126, 134 (2003) ("Drug smuggling and drug use in prison are intractable problems.").

[76] *Turner*, 482 U.S. at 91.

[77] *See* Mot.

[78] *Id.* at 10.

[79] Hr'g Test. 13 ¶ 3–6.

[80] 8 U.S.C. § 1226; *see* Mot. 8.

[81] *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

care, including emergency services."[82]  Under the PBNDS, medical care includes the prevention of self-harmful behavior,[83] including hunger strikes.[84]

The state's interest in preventing the death of an individual in its custody is paramount. The Supreme Court clearly held neither the Fifth nor Fourteenth Amendments support the due process right to commit suicide.[85]  Thus, allowing Respondent to starve himself to death would violate the obligations the United States owes as a custodian.[86]

Respondent no doubt has a liberty interest in conveying his message and in directing his own medical care.  However, while in federal custody, his interest is diminished as his chosen avenue of conveying his message, suicide by starvation, is not a liberty interest protected under the Constitution.[87]

The next step in applying *Youngberg* is to evaluate the testimony of ICE Doctor.[88]  A professional[89] is afforded deference in so much as the judgment is not "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."[90]  ICE Doctor

---

[82] PBNDS § 4.3(I).

[83] *Id.* at § 4.6.

[84] *Id.* at § 4.2.

[85] *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997).

[86] *Aamer v. Obama*, 953 F. Supp.2d 213, 221 (D.D.C. 2013), *aff'd on other grounds*, 742 F.3d 1023 (D.C. Cir. 2014).

[87] *Glucksberg*, 521 U.S. at 728.

[88] *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982).

[89] *Id.* at 323 n.30 (1982) ("By "professional" decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing . . .").

[90] *Id.* at 323.

testified specifically that Respondent's body is "very weak."[91]  ICE Doctor goes on to say

Respondent has "absolutely no energy" and rarely is observed communicating.[92]  Therefore, it is

ICE Doctor's judgment that Respondent is "in danger" for "muscle breakdown, which includes

cardiac muscle, . . . his heart and potential irreversible organ damage, usually affecting the

kidneys."[93]  This will lead to death if untreated.  It is this opinion the court will evaluate for

deference.

    In his Supplemental Brief, Respondent attaches the opinion of Dr. Parmar.[94]  Therein, Dr.

Parmar analyzed Respondent's medical data and rendered her opinion.[95]  Critically, Dr. Parmar

did not contradict ICE Doctor's testimony that Respondent was in a life-threatening situation.[96]

Dr. Parmar's affidavit is critical of the approach taken by ICE, but consistently reiterated the

seriousness of the threat Respondent faces.[97]  Both experts' agreement on this point makes it

clear to this court that ICE Doctor's opinion regarding the danger to Respondent's health and

need for immediate action is not a departure from accepted medical standards.

    It is undisputed Respondent is 61 days into a hunger strike.[98]  He testified he would only

end the hunger strike if released from ICE custody.[99]  His BIA appeal is currently pending, with

---

[91] Hr'g Test. 36 ¶ 25.

[92] *Id.* at 35–37 ¶¶ 25, 1–2.

[93] *Id.* at 36 ¶ 14–19.

[94] Parmar Aff.

[95] *Id.* at 2.

[96] *See generally id.*

[97] *Id.* at 2–6.

[98] Sept. 9 Decl. 1.

[99] Hr'g Test. 65 ¶ 18.

no information as to its resolution date.[100]  Without intervention, Respondent's hunger strike will kill him.  In situations where a detainee's life is at great risk, the government is required to act.

C.    *Forced Feeding Is Necessary Considering Respondent Faces Imminent Serious Harm*

The court must now determine what is necessary to effectuate the state interest to protect the Respondent from imminent death.  The options presented to the court are a bond hearing,[101] forced feeding,[102] or transferring Respondent to a community hospital.[103]

### 1.    Bond Hearing

Respondent argues the Attorney General could simply release him on bond—thus ending his hunger strike.[104]  This is true.  8 U.S.C. § 1226 grants the Attorney General authority to release an alien on bond or conditional parole.[105]  However, this court does not have the authority to order this action.[106]  The decision of whether to release a detainee rests solely in the discretion of the Attorney General.[107]  There are no judicial enforcement mechanisms making this a credible alternative.[108]  While it is advisable that bond be considered, the court does not have jurisdiction to order a bond hearing.  To put it plainly, waiting to authorize force feedings until

---

[100] Mot. 2 ¶ 1.

[101] Resp. 12.

[102] *See* Mot. 10.

[103] Resp. 12–13.

[104] *Id.* at 12.

[105] 8 U.S.C. § 1226(a)(2).

[106] 8 U.S.C. § 1226(e) ("The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.").

[107] *Id.*

[108] *Id.*

14

ICE exercises a discretionary measure would jeopardize Respondent's life. Therefore, a bond hearing is not a viable alternative.

2.    Transferring Respondent to a Community Hospital

Respondent suggests transferring him to a community hospital as an alternative to force feeding.[109]  The Government ripostes that transferring Respondent to a community hospital is futile, as Respondent would decline medical treatment at a hospital.[110]  However, the court does not see rejection of medical treatment as a certainty.  Hospital staff are trained to treat patients with respect and professionalism, and having medical information discussed in a different environment could yield different results.  This is especially true given Respondent's discussion of the conditions at ICE facilities.[111]  Respondent in fact testified he would allow an independent doctor to evaluate his condition.[112]

However, Respondent's health has deteriorated to the point where transferring him to a community hospital is not a viable alternative.  Respondent's condition has grown markedly worse, as even Dr. Parmar attests in her affidavit.[113]  His malnutrition is life threatening and he is at risk for "potentially irreversible organ damage."[114]  ICE Doctor testified that IV fluids are not enough to prevent Respondent's death.[115]  She also testified that outside medical facilities in El

---

[109] Supp. Brief 1.

[110] Sur-Reply 6.

[111] *See* Hr'g Test. 61–66.

[112] *Id.* at 65 ¶ 21.

[113] *Id.* at 31 ¶ 6; Parmar Aff. 2–6.

[114] Hr'g Test. 30–31 ¶¶ 23–25, 1–3, 36 ¶ 18.

[115] *Id.* at 35–36 ¶¶ 23–25, 1–19.

Paso, Texas refuse to force feed individuals who decline medical treatment.[116]  Respondent

testified he will not eat until his release from ICE custody.[117]  If transferred to a community

hospital, Respondent would remain in ICE custody.[118]  Therefore, transferring Respondent to a

community hospital would not provide him with the necessary nutrition to save his life.

### 3.    Forced Feedings

The only option remaining to the court is to order force feeding.  Respondent is adamant

that he will not voluntarily eat until his release from ICE custody.[119]  This court cannot order his

release from ICE custody.[120]  The court cannot fathom Respondent strictly surviving on IV

fluids, and it is well-documented that a community hospital would not perform nasogastric

feedings.[121]

ICE Doctor testified that there are two methods of force feeding: nasogastric and a

percutaneous endoscopic gastric ("PEG") tube.[122]  PEG is a "surgical procedure into the stomach

to have a tube where you would just pour the shake directly into the stomach."[123]  In comparing

the two, she described nasogastric as the less intrusive and carrying less risks than the PEG

tube.[124]  Neither Respondent nor Dr. Parmar contest this comparison.[125]  Nasogastric feedings

---

[116] *Id.* at 51 ¶ 15–25.

[117] *Id.* at 65 ¶ 18.

[118] *Id* at 51–52 ¶¶ 15–25, 1.

[119] *Id.* at 65 ¶ 18.

[120] 8 U.S.C. § 1226(e).

[121] Hr'g Test. 51 ¶ 15–25.

[122] *Id.* at 58 ¶ 8–18.

[123] *Id.* at 50 ¶ 19–24.

[124] *Id.* at 50 ¶ 19–21.

[125] *See* Supp. Brief; Parmar Aff.

will give Respondent the necessary nutrition to stay alive.[126]  Therefore, the least intrusive

medical course of action that will fulfill the state's obligation to keep Respondent alive is to

allow nasogastric feedings to continue pursuant to the court's previous order.[127]

## III.   CONCLUSION AND ORDERS

It is troubling that Respondent was not brought to an independent doctor for immediate

evaluation upon initiation of his hunger strike.   While he was seen for flank pain at a community

hospital,[128] ICE Doctor testified that Respondent has not been seen for his condition regarding

malnutrition.[129]  Additionally, Dr. Parmar pointed out various times where ICE treatment may

have fallen below acceptable standards.[130]

For example, the nasogastric tube was placed twice unsuccessfully due to the tube

coiling.[131]  ICE Doctor described the coiling as something she had "never seen before."[132]  Dr.

Parmar expressed concern that ICE Doctor failed to perform further investigation as to the cause

of coiling, given the rarity of that complication.[133]   At the Motion hearing, ICE Doctor stated she

would recommend Respondent receive an endoscopy.[134]  The ICE facility holding Respondent

---

[126] Hr'g Test. 46 ¶ 16–20.

[127] Order for Suppl. Auth.

[128] Hr'g Test. 19 ¶ 10–11.

[129] *Id.* 33 ¶ 14–18.

[130] Parmar Aff. 3–7.

[131] Hr'g Test. 10 ¶ 9–12.

[132] *Id.* at 47 ¶ 16–24.

[133] Parmar Aff. 8.

[134] Hr'g Test. 49 ¶ 6–17.

cannot perform this test.[135]   Despite this recommendation, ICE Doctor did not refer him to a community hospital.[136]

Dr. Parmar also takes issue with ICE Doctor's visitation records—which indicate only four visits on or before August 14, 2019.[137]   This is concerning due to his "profoundly abnormal vital signs."[138]   ICE Doctor testified that she does not always document her conversations with Respondent.[139]   She described the undocumented conversations as "informal."[140]   However, Dr. Parmar notes this is "well below the standard of care to see a patient and not document your visit/an assessment."[141]   Critically, it is in violation of PBNDS § 4.2, which states *"records shall be kept of all interactions with the striking detainee . . . ."*[142]

Dr. Parmar also points to various aspects of Respondent's treatment that may place him at a greater risk for harm.   These risks include worsening colitis,[143]  a severe lack of fluids,[144] orthostatic hypotension,[145] and inadequate calories.[146]   Dr. Parmar repeatedly states

---

[135] *See Id.* at 53 ¶ 7.

[136] *Id.*

[137] Parmar Aff. 3.

[138] *Id.*

[139] Hr'g Test. 43 ¶ 5–7.

[140] *Id.* at 43 ¶ 9–10.

[141] Parmar Aff. 3–4.

[142] PBNDS § 4.2(V)(c)(9) (emphasis added).

[143] Parmar Aff. 6.

[144] *Id.* at 3.

[145] *Id.*

[146] *Id.*

administering IV fluids would address several of these concerns[147]—something this court's previous order empowered ICE to effectuate.[148] Dr. Parmar also states that ICE failed to give "appropriate attention" to Respondent's "critically low blood pressure."[149]

Serious as Dr. Parmar's criticisms are, the Government chose not to provide a rebuttal or acknowledge mistakes in Respondent's medical care.[150]

The record before this court shows ICE is acutely aware of hunger strikes. In this case, Respondent was placed on force feeding protocol after missing nine meals in accordance with PBNDS.[151] With this acute awareness of a detainee's health, there is no excuse for ICE to not bring a hunger striking individual to an independent doctor prior to seeking court intervention. The PBNDS permit transferring an individual who initiates a hunger strike to a community hospital.[152]

While it is certainly possible that a detainee could refuse medical treatment by an independent doctor, it is clearly preferable to see that situation come to pass than to deal with hypothetical refusals. Even if a detainee were to refuse medical treatment, an independent doctor could assess the collected vitals and submit a report to this court—like Dr. Parmar did. Respondent testified he would accept an examination by an independent doctor.[153] Furthermore,

---

[147] *Id.*

[148] Order of Auth. 3; Order of Suppl. Auth. 2–3.

[149] Parmar Aff. 4.

[150] *See generally* Sur-Reply.

[151] Mot. 3 ¶ 2; PBNDS § 4.2(II)(1).

[152] PBNDS § 4.2(V)(c)(7) ("If medically necessary, the detainee may be transferred to a community hospital or a detention facility appropriately equipped for treatment.").

[153] Hr'g Test. 65 ¶ 19–21.

ICE Doctor testified she would welcome a second opinion "regarding the need to force feed Mr. Kumar."[154]  The court has no reason to doubt either Respondent or ICE doctor on this point.

It is the duty of the Government to provide adequate medical care, not just to keep Respondent alive.[155]  Based on ICE Doctor and Dr. Parmar's concurring opinions, the court informs the Government that in future cases it is both prudent and in the interest of justice for ICE to bring an individual on a hunger strike to an independent doctor prior to seeking a court order to begin nasogastric feeding.  This practice will expedite the fact-finding process and allow a thorough examination—allowing the court to properly ensure civil detainees receive proper medical attention.

In this case, Respondent is facing too great a risk of organ failure, muscle atrophy, and death.  Thus, the court has no other alternative except to maintain the order authorizing forced feeding.

Accordingly, the court enters the following orders:

1.  It is **HEREBY ORDERED** that, pursuant to 28 U.S.C. § 1651, the medical staff at DHS, ICE, SPC or other providers, who are under contract with ICE to provide for the medical care of detainees, may perform laboratory tests and physical evaluation, to non-consensually hydrate in the form of IV fluids, and utilize nasogastric tube placement with necessary enteral feedings as needed to assure Mr. Kumar's condition does not decompensate to a critical juncture.

2.  It is **FURTHER ORDERED** that if, after the medical providers perform the involuntary medical examinations and non-consensual hydration, the medical providers feel that in their medical judgment, more intrusive medical procedures are necessary to preserve the life and health of Mr. Kumar, ICE will seek further Court approval.

---

[154] *Id.* at 52 ¶ 21–23.

[155] *Aamer v. Obama*, 953 F. Supp.2d 213, 221 (D.D.C. 2013), *aff'd on other grounds*, 742 F.3d 1023 (D.C. Cir. 2014).

3.     It is **FINALLY ORDERED** that Immigration and Customs Enforcement **SHALL** provide **bi-weekly** status updates as to Ajay Kumar's condition.

**SO ORDERED.**

**SIGNED** this **12th** day of **September, 2019.**

_____
**FRANK MONTALVO**
**UNITED STATES DISTRICT JUDGE**